[L. A. No. 1127.   Department Two.—December 5, 1903.]

# FIRST NATIONAL BANK OF REDLANDS, Appellant, v. GERTRUDE S. BOWERS, Respondent.

GUARANTY TO BANK — DRAFT FOR ORANGES — "BILLS OF LADING AT- TACHED "—EVIDENCE OF FACTS AND CIRCUMSTANCES—QUESTION FOR JURY.—A guaranty to a bank of ninety per cent of the face value of all drafts for oranges "with bills of lading attached," ·drawn by a fruit company in favor of the bank during a specified orange season, is not sufficiently clear and obvious as to the meaning of the phrase "with bills of lading attached" to justify the court in a construction of it as matter of law, and in refusing to permit the jury, under the evidence disclosing the facts and circumstances surrounding its execution, to determine what the parties intended by those words, the meaning of which was disputed. Such determina- tion was the province of the jury, and not of the court.

ID.—CONSTRUCTION OF GUARANTIES—EXPLANATION—INTENTION OF PAR- TIES.—Contracts of guaranty, like all other contracts, should receive a fair and liberal interpretation, according to the true import of their language, and may be explained by reference to the circum- stances under which they were made and the matter to which they relate, the main object being to ascertain and effectuate the in- tention of the parties.

APPEAL from a judgment of the Superior Court of San Bernardino County and from an order denying a new trial. Frank F. Oster, Judge.

The facts are stated in the opinion of the court.

Otis & Gregg, and J. S. Chapman, for Appellant.

Edward R. Annable, and Hunsaker & Britt, for Respond- ent.

LORIGAN, J.—Plaintiff brought this action to recover from the defendant $12,529.92 upon a contract of guaranty executed by her in its favor.

The trial was had before a jury, and at the close of the evidence the court, over plaintiff's objection, instructed the jury to return a verdict in favor of defendant, which was done, and judgment entered thereon.

Plaintiff moved for a new trial, which was denied, and from the order denying said motion and from the judgment it appeals.

The contract of guaranty upon which the action is brought is as follows:—

"Redlands, Cal., Dec. 1, 1897.

"To the First National Bank of Redlands, Cal.

"I hereby guarantee to said bank ninety per cent (90) of the face of all drafts for oranges (with B-L attached), drawn by the Haight Fruit Co., in favor of said First National Bank during the orange season of 1897 and '98.

"Gertrude S. Bowers."

It was admitted upon the trial that the letters "B-L" were intended by the parties to mean "bill of lading."

It appears from the evidence, that the Haight Fruit Company, after the execution of such contract of guaranty by defendant, and its delivery to plaintiff, made at different times drafts in favor of plaintiff, upon the respective parties to whom in the various cities of the United States consignments of oranges were shipped; that each of said drafts had attached to it the bill of lading of the particular consignment for which it was drawn on the consignee, and all said drafts were drawn on a printed form used by the Haight Fruit Company, which contained, among other things, the following: "Instructions to the Bank.—This collection covers goods now in your city. Please present for acceptance without delay, but hold until goods arrive, if necessary. Do not return documents unless instructed from California to do so. Permit inspection on track. Deliver bill lading or order on acceptance of draft. If not accepted immediately on arrival of goods, wire direct to Haight Fruit Company, Redlands, California, and follow their instructions." That all of said bills of lading, attached to said drafts, were either issued by the transportation companies directly to the consignees, or to the Haight Fruit Company, and specially indorsed by it to said consignees; that none of them were either issued, or indorsed to, said bank; that, upon the delivery of said drafts with such bills of lading attached, the plaintiff advanced to the Haight Fruit Company, on the faith of said guaranty, ninety per cent of their face value; that a large proportion

of said drafts accompanied by bills of lading, were drawn by the Haight Fruit Company on its own agents in eastern cities, for the purpose of enabling them to make sale of consignments of oranges described theiein, and others were on particular purchasers in different eastern cities. That each of said drafts, with bill of lading attached, was forwarded by the plaintiff to its business correspondent in the city where the drawee and consignee resided for presentment, acceptance, and payment.

It further appears from the evidence that the Haight Fruit Company had a contract with the railroad companies over whose lines its consignments were sent, whereby the fruit company could, at any time, have said consignments while *en route* diverted from one point to another, or from one consignee to another, or delivered to its agents without the production or surrender of the bills of lading attached to the draft, and that it did so whenever it chose; that all of said drafts sued on were returned to plaintiff by its eastern bank correspondents unpaid, accompanied in all but a few instances by the original bills of lading which were sent; that none of said drafts sued on were presented for payment to the drawees therein; that said plaintiff during said season advanced on said drafts $130,051.52, all of which was collected from the drawees named therein, save the amounts sued on.

There was also evidence introduced on the part of the plaintiff, tending to prove that the Haight Fruit Company for many years theretofore had been, and at the time of the guaranty in question was, largely engaged in Southern California, at Redlands and its vicinity, in purchasing and shipping oranges to the eastern market.

It owned no orange-groves of its own, but in common with others engaged in the same enterprise the company purchased entire, or partial, crops of oranges from the owners thereof early in the season, while the fruit was on the trees, and long before it had ripened, so as to be ready, when the shipping period arrived, to successfully compete with those engaged in the same business.

That the company was not financially able, on account of the extensive purchases necessary to be made, to command from its own resources sufficient money to pay for these crops,

as payments by the owners were required, which were in advance when the contract of purchase was made, and usually full payment when the fruit was delivered, and was, therefore, compelled to make arrangements so that the capital necessary therefor during the shipping season would be supplied by a bank under some security furnished by a third party, and it was with this end in view that defendant's guaranty was secured, though the matter of its procurement will be referred to more particularly later on.

That the general conduct of the business during the shipping season, both in previous years and during the season for which the guaranty in question was given, required that the company should have, and it did have, agents employed in several of the principal eastern cities, whose duty it was to obtain purchasers and markets for, and to attend to the interests of the company in, the sale of fruit consigned there. These agents would notify the company that they had made the sale to different persons, or firms, of such a number of boxes or carloads of oranges, and thereupon the company would consign to these agents, for delivery to such persons, the required shipments, transmitting at the same time a draft for the purchase price, with bill of lading attached. All shipments were made subject to inspection by the consignees. On the arrival of the goods, in some instances, these consignees would refuse to accept them; a refusal which might, or might not, be based on sufficient grounds,—perhaps the goods were damaged, or a depressed market might make it to the interest of the consignee to refuse acceptance. Be the reason what it might, the consignee thus refusing to accept, the agent of the company at the place of consignment would have to take immediate possession of the fruit and sell it to the best advantage. Under such circumstances, as the consignments were not accepted by the consignees, the drafts against them would not be accepted, and hence not presented.

In other instances orange crops, which the company had purchased, would be ripe, and the owners insistent that they should be gathered and paid for. At this time the eastern market might be depressed and the agents of the company unable to make sales. Under these circumstances, as the fruit could be kept only a limited time after being picked, the cars

would be loaded with it, and billed to some agent in a distant city—for illustration, say Boston. While being gotten ready for shipment, and after the shipment was started on its way to the Boston agents, the company would by telegraph notify such agents, and its other agents in different cities, of the transmission of such unsold consignment, and direct them to look out while the consignment was in transit for a market therefor, because, if the consignment was permitted to reach Boston a sale of it might not be advantageously effected. In response to these notices, it frequently happened that an agent somewhere else,—say at Chicago,—or several agents along the route, would find purchasers for the whole or separate carloads of the oranges. To meet these contingencies, under its arrangement with the railroad company, the consignment directed to Boston would be diverted from its destination to such point where these other agents had procured sales for it. If, for example, this consignment originally destined for Boston should be diverted to Chicago, it would be received and disposed of in that market without either draft or bill of lading, as both these would have gone on to Boston where the consignment was originally billed, but which it never reached.

In other cases, consignments would be made to particular eastern purchasers, with drafts against them for the purchase prices, and accompanying bills of lading. Often these parties would refuse to accept the consignment. Under these circumstances the drafts would not be presented against the consignees. In such cases the consignments would be taken by the agents of the company in the locality, and sold out at retail to the best advantage, and perhaps to a dozen different persons.

In some instances consignments arrived at their destination, and on inspection were found so damaged in transportation as to be of little or any value, and consequently refused.

In some of the instances referred to it would be useless to present the drafts for either payment or acceptance, and in others they could not be, because the consignments had been diverted to points other than the original destination to which the drafts had proceeded.

CXLI. Cal.—17

In all instances, however, where sales were made, whether of consignments diverted from the destinations specified in the bill of lading and sold by the agents of the company in other cities, or made by agents after the particular consignees had refused to receive the shipments, or accept, or pay the drafts therefor, the proceeds were turned in to the credit of the drafts drawn, to the extent that anything was realized.

The business of the company was not only conducted in this manner during the seasons previous, but similar methods were employed and like transactions arose during the season to which the guaranty of defendant applied. The evidence not only showed these facts, but there was likewise evidence tending to show that the defendant was fully informed of the way in which the business was theretofore conducted, understood all about it, and that it was intended to be transacted under her guaranty, in the same manner.

This guaranty was given by her in furtherance of the interests of her nephew, who desired to purchase an interest in the fruit company. To this end she advanced him the money to purchase stock in the Haight Fruit Company, and at the same time agreed to advance that company money from time to time as required in the transaction of its business. This she did for some time personally, but shortly after the shipping season opened an arrangement was made by her, with the officers of the plaintiff bank, which resulted in the execution and delivery of the contract of guaranty sued on. There was additional evidence upon all these matters given in the case, but we have set forth this much as sufficient under which to discuss the principles of law which we deem applicable. The main and important question on this appeal, and the only one which it will be necessary to consider, is the correctness of the action of the court in instructing the jury, in the face of the recited and similar evidence, to return a verdict for the defendant. The giving of this instruction is the principal ground for reversal urged by appellant.

We are not clearly advised from the record upon what ground the lower court based this instruction to the jury. It must have done so, however, by construing the contract of guaranty as meaning in the use of the term "bill of lading attached," that such bills of lading as accompanied the

drafts should have been transferred to the bank by the Haight Company, so as to operate as a pledge of the oranges against which such drafts were drawn, and as security for the benefit of the guarantor, and by such transfer to place the consignment under the absolute control of the bank and beyond the control of the drawer—the Haight Fruit Company; that this was a condition precedent to her liability under the guaranty, and not having been complied with, such liability never attached; or, the court may have based its instruction on the fact that the drafts sued on were never presented to the drawees for acceptance, and hence if any liability ever did attach, this failure on the part of the plaintiff to so present them relieved and exonerated her from responsibility. The action of the court on the record cannot be defended on any other grounds, and we have no doubt that the court based its instruction on the first, because this is the proposition to which the briefs of counsel on both sides are principally addressed.

Respondent's contention in the court below was, and the view which the lower court took of the contract of guaranty, by refusing to permit the jury to take into consideration the facts and circumstances attending and surrounding its making, as disclosed by the evidence, for the purpose of determining the meaning of the term "bill of lading attached," as used in the contract, must have been, that the language of the contract on this subject was plain and obvious, and not open to any examination or investigation by the jury under a consideration of such facts and circumstances; that by its terms the contract of guaranty plainly provided that the bank should with all drafts discounted by it; have taken as security therefor a valid pledge of each consignment of oranges, against which the draft was drawn, by having the bill of lading therefor either issued, or transferred to itself, and retain exclusive control over the consignment, and that, as not only were none of these bills of lading drawn in favor of, or assigned to the plaintiff, but it cashed drafts which, on their face, all expressly reserved to the company the control of the consignments represented by such bills of lading, the defendant was not liable. We cannot, however, agree with the lower court in this view. We do not perceive that

the terms of this guaranty were so plain, or the meaning so certain, as to warrant the court in itself construing the instrument, and refusing to permit the jury, under the evidence disclosing the facts and circumstances surrounding its execution, to determine what the parties intended by its disputed terms.

To sustain the view taken by the court, it was certainly necessary to import into the language which was used by the parties, terms which were plainly not expressed therein, and which could only exist as a matter of construction.

The court construed the contract upon its face as a plain, clear guaranty, which was not affected by any of the facts and circumstances attending its execution; either the situation of the parties, or the object to be attained, or subject to be construed under any of the aids which the law affords for the interpretation of contracts.

There is nothing expressly said in the contract of guaranty about the plaintiff taking bills of lading as a pledge, or retaining control over them as security for the drafts cashed. There is nothing in the terms used wholly inconsistent with permitting the Haight Fruit Company to control the disposition of the consignments represented by the bills of lading. If there is, it is only by construction. On the face of the guaranty there is nothing said as to who shall have the control of the oranges. Nor is it obviously apparent therefrom, that the requirement that bills of lading should be attached to the drafts, was for any other purpose than to serve as a guide to the plaintiff in determining whether the drafts presented by the company should be cashed by it, or not. No drafts could be cashed except for oranges—no other shipments of fruit—and the bill of lading would furnish, and might possibly be intended to furnish, the best information, that the drafts were for consignments of oranges represented thereby, as the guaranty contemplated they should be. It was a question, whether the bank was required under the contract, to do any more than to see that there was a bill of lading accompanying each draft, professing on its face in the ordinary form of such documents to represent a consignment of oranges. It was also a question, whether it was intended that the turning over of these bills of lading with the drafts

was for any other purpose than that the plaintiff through
its correspondents might receive the proceeds of the sale of
the fruit made by the company in payment of the discounts
made on the drafts therefor.   On the other hand, for the
court to construe the phrase "bills of lading attached" to
mean that such bills were required to be made out in favor
of, or indorsed to plaintiff, and held, retained, and dealt with
as pledges securing the drafts, with all the responsibilities
and liabilities to be assumed by the plaintiff under such con-
dition, was to incorporate into the instrument, by construc-
tion, more than it expressly contains, and to give it an effect
which, on its face, it is not disclosed the parties contemplated.

We do not say that this may not have been the intention,
but it does not clearly or obviously follow from the language
of the guaranty, and in the dispute between the parties as to
its meaning, this could only be properly determined by a
consideration of all the facts and circumstances surrounding
its execution, and in the case at bar this was the province of
the jury and not of the court.

That the defendant herself did not think that the con-
struction placed by the court upon this contract was so ob-
vious or apparent is disclosed by her answer, in which she
sets forth that it was understood by the terms of said contract
that a lien would be created against said oranges represented
by said bills of lading.   It was the determination of this ques-
tion, as to what was the meaning of the term "bill of lading
attached," that the appellant insists should have been sub-
mitted to the jury under all the evidence, and in this we think
appellant was right.   Contracts of guaranty are not affected
by rules different from those employed in construing other
contracts, but, like all other contracts, should receive a fair
and liberal interpretation, according to the true import of
their language, and may be explained by reference to the
circumstances under which they are made and the matter to
which they relate.   (Civ. Code, sec. 1647.)   "As guaranties
are contracts of extensive use in the commercial world, upon
the faith of which large credits and advances are made, care
should be taken to hold the party bound to the full extent of
what appears to be his engagement. Letters of guaranty are
commercial instruments, generally drawn up by merchants,

sometimes inartificial and often loose in their structure and form. They should not, therefore, be construed with nice and technical care; but, according to the facts and circumstances accompanying the transaction, holding in view as the main object to ascertain and effectuate the intentions of the parties." (2 Daniel on Negotiable Instruments, p. 791.) The rule is correctly stated in *Mauran* v. *Bullus,* 16 Pet. 533, where the court say: "The questions in this case arise on the instructions of the court; and they very properly, as we think, refer the jury to the facts and circumstances under which the guaranty was given. It is only by such reference that that instrument can be correctly understood and construed. In the construction of instruments, to ascertain the intention of the parties is the great object of the court; and this is especially the case in acting upon guaranties." In *Thompson* v. *McKay,* 41 Cal. 228, the court says: "The rule is well established that, in construing doubtful instruments, they must be interpreted in the light of the surrounding circumstances. After ascertaining the relation of the contracting parties to each other, and the subject-matter of the contract, the court will, if possible, so construe the instrument, however inartificially drawn, as to give effect to the intention of the parties, provided it can be done without disregarding the language of the instrument, when all its parts are considered." To the same effect are *Walsh* v. *Hill,* 38 Cal. 481; *Lafargue* v. *Harrison,* 70 Cal. 385;[1] *London etc. Bank* v. *Parrott,* 125 Cal. 472;[2] *McCasland* v. *O'Brien,* 57 Ill. App. 636; *Wills* v. *Ross,* 77 Ind. 1;[3] *Crest* v. *Burlingame,* 62 Barb. 351; *Bell* v. *Bruen,* 1 How. 169; *Lee* v. *Dick,* 10 Pet. 482; *Graham* v. *Farmers' etc. Bank,* 116 Cal. 466. The purpose to be subserved by this rule is to place the court, or jury, in the position of the parties at the time the contract was made, and enable it to intelligently interpret the language used by them. Facts which tend to illustrate or explain the language used in the contract, and to place the court or jury as nearly as may be in the situation of the parties as they contracted, are always admissible when the meaning of the terms used is debatable. Under these principles the plaintiff

[1] 59 Am. Rep. 416.                    [3] 40 Am. Rep. 279.
[2] 73 Am. St. Rep. 64.

had a right to have submitted to the jury the question of what was intended, understood, and meant by the parties in the use of the term "bill of lading attached." It was for the jury to determine whether it was intended by the use of this term, that all such bills of lading should be issued in favor of the bank, or transferred to it by the Haight Fruit Company, so as to operate as a pledge of the consignment of oranges, to be held as security for the benefit of defendant, to the extent of her liability on the accompanying draft; whether it was intended thereby to divest the fruit company of all control over these consignments, and to require the bank thereafter to retain absolute and exclusive control of them for all purposes; not only to require payment of the drafts by the consignees, but upon failure to do so to employ agents or brokers at the point of destination to dispose of the consignments, or to take such other measures as the law requires concerning the disposition of pledged property.

Or, on the other hand, did the attending facts and circumstances show that no pledge of the oranges or indorsement of the bills of lading to plaintiff as security for the drafts was contemplated or intended, and that it was the intention of all parties that the method of dealing, and the manner of conducting business, as theretofore done by the fruit company, and claimed to have been known by the defendant, including the control and disposition by said company of these consignments represented by the bills of lading, was to be continued under the guaranty.

This was a matter for the consideration of the jury. It was for them to determine the extent and the meaning of the contract, as the facts and circumstances surrounding its execution disclosed the intention of the parties.

If the jury should find that it was intended that the business under the guaranty should be conducted as previously done, and that the control of these consignments should, as theretofore, remain with the fruit company, and that it should have the disposition of them as the exigencies and necessities of the business should require, that no pledge or security by transfer of the bill of lading to the bank was contemplated, then there was no obligation imposed upon the plaintiff under the guaranty which it failed to perform, and

the fact that the plaintiff failed to present the drafts sued on to the drawees named therein was of no moment, because all these drafts were against consignments, either diverted by the company from the original consignees, or were against consignments refused by the drawees, and taken possession of by the company's agents and sold, and under such circumstances it would have been an idle and useless ceremony to have presented the drafts for payment, and plaintiff was not required to do so.

Much argument is advanced on both sides why this contract should be construed under the view that each party takes of it. · It is not our province to enter into any discussion of that matter.

These arguments will be properly addressed to the jury when the matter of the interpretation of the contract is submitted to them under the evidence. What we now hold is, that the court should not have taken that matter from the jury, but, under proper instructions, have submitted it to them for their determination under all the evidence.

The order denying a new trial is reversed and the cause remanded.

McFarland, J., and Angellotti, J., concurred.

Hearing in Bank denied.