[Sac. No. 2966. In Bank.—May 26, 1922.]

THOMAS O'CONNOR, Executor, etc., Respondent, v.
WEST SACRAMENTO COMPANY et al., Appellants.

[1] LANDLORD AND TENANT—LEASE OF AGRICULTURAL LANDS—TERMI-
NATION BY LESSOR BEFORE EXPIRATION OF TERM—REIMBURSEMENT
OF LESSEE — CONSTRUCTION. — Where a lease of several hundred
acres of agricultural land provided that the lessor should have
the right at any time or times after a designated date to termi-
nate the lease as to the whole or any portion of the premises, the
term "per acre per year" contained in the provision of the instru-
ment for reimbursement of the lessee on such a termination had
reference to the unexpired and not to the whole term of the lease.

[2] ID.—CREDIT ON RENT—CONSTRUCTION OF PHRASE.—Where a lease
of agricultural lands reserved a lump sum as rental payable in
unequal installments at irregular periods, and provided that the
lessor might terminate the lease at any time after a fixed date,
and that the lessee should, in case of such termination, be re-

imbursed at different rates per acre, the same to be "a credit on the rent," such phrase had reference to a credit on the whole amount of rent due.

[3] ID.—REIMBURSEMENT OF LESSEE — ESTIMATION OF AMOUNT—CONSIDERATION OF LUMP RENTAL.—Where a lease of agricultural lands provided that the lessor might terminate it, in whole or in part, after a fixed date by making certain payments per acre per year to be allowed as credits on the rent, the lump sum rental for the whole term was considered an obligation of the lessee in estimating the amount to be paid by the lessor upon the termination of the lease, whether whole or partial, and the court cannot read into the reimbursement provision the words "due and unpaid" as to the rent upon which the allowance was to be credited.

[4] CONTRACTS — CONSTRUCTION—QUESTION OF LAW.—The construction of a contract is always a matter of law for the court, no matter how ambiguous or uncertain or difficult its terms, and the jury can only assist the court by determining disputed questions of fact.

[5] LANDLORD AND TENANT — RECOVERY UNDER LEASE—INTENTION OF PARTIES—ERRONEOUS INSTRUCTION.—In an action by a lessee to recover reimbursements alleged to be due him under the provisions of the lease upon its termination by the lessor before the expiration of the term, it is error to submit to the jury the question of the intention of the parties to be derived in part from the language of the contract and in part from extrinsic evidence.

[6] ID.—CONSTRUCTION OF CONTRACT — ERRONEOUS INSTRUCTION.—An instruction in such an action which assumed that the parties drew a contract, whose construction must be reasonable and just under all the circumstances, whereas the real question for determination was the meaning of the written agreement, was erroneous.

[7] ID.—DETERMINATION OF AMOUNT OF REIMBURSEMENT—EFFECT OF STIPULATION.—Where in an action by the lessee under such a lease to restrain the lessor from taking possession of the land in pursuance of its notice terminating the lease for unpaid rents it was stipulated that the defendant should surrender possession and that the amount due the plaintiff on account of reimbursements should be submitted for determination, the defendant cannot claim that the plaintiff was estopped by a selection of remedy inconsistent with a right of compensation, or that the failure to surrender possession before suit was a breach which prevented recovery.

[8] ID.—LEASE—REAL PARTY IN INTEREST—ABSENCE OF FRAUD.—The representation by a party to a lessor that he was the lessee, when, in truth and fact, he was acting for a corporation, composed of himself and his brothers, is not fraudulent, where the lease was made to such party individually and the corporation was not formed until after the lease was executed.

APPEAL from a judgment of the Superior Court of Yolo County.   W. A. Anderson, Judge.   Modified.

The facts are stated in the opinion of the court.

Arthur C. Huston, Harry L. Huston, Charles W. Slack, Chauncey S. Goodrich and John T. Pigott for Appellants.

John S. Partridge, Elmer W. Armfield and Arthur B. Eddy for Respondent.

WILBUR, J.—In its final form this action is one to recover from the defendant landlord an amount claimed to be due the plaintiff tenant under the terms of the lease upon the termination on November 2, 1917, of the lease wherein the landlord let to the tenant 403.4 acres of land for three years from November 1, 1916, to and including October 31, 1919, at a gross rental of $16,740.75, to be used for the planting and raising of alfalfa.   The landlord admits an indebtedness of $2,955.52 and tendered that amount.   The tenant claims $20,451.75 as the proper amount.   The jury returned a verdict for $13,625 and the defendant appeals from the judgment rendered thereon.   The provision of the lease involved is as follows:

"15. The Lessee further covenants and agrees that the Lessor shall have the right, at any time or times after the first day of June, 1917, to terminate this lease, and the estate hereby granted, as to the whole or any portion of the said premises, by notice in writing to the Lessee, given either personally to the Lessee, at least thirty (30) days prior to such termination, as follows:

"Mr. J. Harbinson, 915 Second Street, Sacramento, Cal.

"In the event of such termination of this lease, for a portion only of the said premises, this lease shall continue in full force and effect as to the remainder of the said premises, subject to the continuing right of the Lessor to terminate this lease, in the manner hereinafter provided, as to the whole or any portion of the remainder of the said premises. The Lessor further covenants and agrees to compensate the Lessee, for any portion of the said premises, as to which this lease shall be so terminated, as follows:

"If said lease shall be terminated as to any portion of the said premises, designated by green lines on the map or plat attached hereto, the Lessor will compensate the Lessee for each and every acre of the said premises, as to which this lease shall be so terminated, at the rate of Eight and no/100 ($8.00) Dollars per acre per year, if such termination shall occur on or before the first day of November, 1917; at the rate of Ten and no/100 ($10.00) Dollars per acre per year, if such termination shall occur on or before the first day of November, 1918; and at the rate of Twelve and no/100 ($12.00) Dollars per acre per year, if such termination shall occur on or before the first day of November, 1919.

"If said lease shall be terminated as to any portion of the said premises, designated by red lines on the map or plat attached hereto, the Lessor will compensate the Lessee for such portion of the said premises as to which this lease shall be so terminated, as follows:

"The Lessor will compensate the Lessee for each and every acre of the said premises as to which this lease shall be so terminated, at the rate of Twenty and no/100 ($20.00) Dollars per acre per year, if such termination shall occur during the period from June 1, 1917, to July 15, 1917; at the rate of Seventeen and 50/100 ($17.50) Dollars per acre per year, if such termination shall occur during the period from July 15, 1917, to August 15, 1917; at the rate of Sixteen and no/100 ($16.00) Dollars per acre per year, if such termination shall occur during the period from August 15, 1917, to October 1, 1917; at the rate of Fifteen and no/100 ($15.00) Dollars per acre per year, if such termination shall occur during the period from October 1, 1917, to October 31, 1917; at the rate of Seventeen and 50/100 ($17.50) Dollars per acre per year, if such termination shall occur during the period from October 31, 1917, to October 31, 1919.

"Provided, however, such cash reimbursements shall be made by allowing the Lessee a credit on the rent."

The lease contains almost the same provisions with regard to the "reimbursement of" and "compensation to" the tenant in case the landlord constructs "levees, canals, ditches and other works, for the purpose of reclamation, drainage, or irrigation, or any thereof."

The lease in that regard provides as follows:

"The Lessor further covenants and agrees to reimburse the Lessee for any portion of the said premises, over which such levees, canals, ditches or other works shall be so constructed, as follows:

"If such works shall be constructed on any portion of the said premises, designated by green lines on the map or plat attached hereto, the Lessor will compensate the Lessee for each and every acre of the said premises, which shall be covered by such works, at the rate of Eight and no/100 ($8.00) Dollars per acre per year, if such works shall be constructed on or before the first day of November, 1917," etc.

The balance of the clause is identical with the above-quoted clause applicable to the termination of all or any part of the lease as to times and amounts within the green and red line areas, except that the phrase "if such works shall be constructed" is used instead of the phrase "if such termination occur." This clause ends like the other with the proviso: "Provided, however, such cash reimbursements shall be made by allowing the Lessee a credit on the rent."

These two clauses, practically identical, with reference to the use of a part of the premises for irrigation works, etc., and the termination of the lease are obviously used in the same sense, and if we can ascertain the meaning of one it will point to the correct interpretation of the other similar clause.

[1] The tenant's contention is that the clause contains two ambiguities, one the phrase "a credit on the rent" and the other "per acre per year." With reference to the first clause it is said that it is doubtful whether or not the credit "per acre per year" is for the whole term (three years) or for the unexpired term, which in the present instance, as the lease was terminated at the expiration of the first year (November 2, 1917), is two years. Or, to express the doubt in terms of money, the question is whether a credit of $35 or of $52.50 per acre should be allowed in the red boundary area and $20 or $30 in the green. These areas, it may be said, are 371.1 acres in the red and 32.2 acres in the green. There does not seem much room for doubt as to the meaning of the phrase "per acre per year" when it is remembered that the purpose of the "reimbursement" or the compensation is to make compensation

to the tenant for his loss, which is represented by loss of the use of the land occupied by levees, etc., or as to which the lease is terminated for the balance of the term. [2] The other phrase, "a credit on the rent," seems plain enough when it is remembered that the lease reserves a lump sum as rental ($16,740.75) and makes no provision for an annual or monthly rental, or for the payment of the rent in equal installments at yearly, semi-annual or monthly periods, from which it might be inferred that the rent was adjusted with reference to such periods. The only rent mentioned in the lease is in the following phrase: " . . . yielding and paying unto the Lessor, as rental of the said premises, the sum of Sixteen Thousand Seven Hundred Forty and 75/100 ($16,740.75) Dollars, payable by the Lessee to the Lessor, . . . in installments as follows":

These installments are: Two items, $1,323.14 (evidenced by a note executed contemporaneously with the lease) and $1,323.13, total $2,646.27, on June 25, 1917; $3,286.30 on November 1, 1917; $1,963.17, June 25, 1918; $4,257.11, November 1, 1918; $2,293.95, June 25, 1919; $2,293.95, before October 31, 1919. This would make $5,933.57 payable during the first year, $6,220.20 during the second, and $4,597.90 during the third year. The average yearly rental would thus be $5,580.25, or an average annual rental of $13.34 per acre. It seems clear enough that the phrase should be read, "allowing the lessee a credit on the rent (reserved in the lease)." In the case of the larger tract (371.1 acres) the amount agreed to be allowed as a "credit on the rent" is in each instance greater ($20, $17.50, $16, $15, $17.50) than the average rental ($13.34) per acre, and if we assume that the rental value of the two pieces is in proportion to the allowances made in the respective areas, it is evident that the allowance is in each instance greater than the average rental per acre so apportioned. This is the interpretation of the lease adopted by the lessor when he tendered the sum of $2,955.52 at the termination of the lease.

[3] We will now consider the claims made by the respondent tenant. First, it is claimed that the proviso should be construed as though it read "a credit upon the rent *due and unpaid* at the time of the termination of the lease." And, in this connection it is also urged that the termination of the lease *ipso facto* terminated the obliga-

tion to pay rent. It could not be applied to rent due and paid, because money so paid becomes the property of the landlord. It is no longer "rent," nor could the stipulated setoff well be applied to moneys already paid, nor could it well be applied to future rents, for according to the contention of the tenant there would be no future rents. Hence the construction contended for that the proviso applies to rents due and unpaid. But it is presumed that the tenant will pay his rent when due, and if he does there will be no period of time except the day when the rent is due when there will be any rent upon which the amounts specified may be "credited."

As it appears that this theory is the one adopted by the jury, we will give it further consideration. The jury were instructed as follows: "2. If you find that the intention of the parties was that Mr. Harbinson should receive compensation for the balance of the term at the rate of $10 per acre for the 32 acres, and $17.50 per acre for the 371 acres, then your verdict must be for the plaintiff for the sum of $13,625.10."

The jury returned a general verdict for that amount, thus adopting this view. The tenant paid the rental due November 1, 1917 ($3,286.30), and hence the tenant was allowed the reimbursement without "crediting on the rent," for on this theory there was no rent on which to credit it. The fundamental assumption on which this verdict is based is that all rental ceased upon the termination of the lease. This would ordinarily be true and is true here in a sense, for if the allowance to the tenant on termination of the lease in every case is equal to or greater than the rent reserved for the balance of the term, as is the case here, then there will be no further rent paid. Indeed, it is conceded that the landlord must make a payment to the tenant at the termination of the lease and that the tenant makes no further payment to the landlord. The lease as a contract is not terminated. It is still in effect between the parties, and the plaintiff is seeking to recover under its terms. What the parties dealt with in the clauses under consideration was the termination of the tenant's estate in the land, or in the case of irrigation works, etc., of the beneficial use of the land by the tenant. In the absence of any contract with relation to the matter, no doubt the

tenant's obligation to pay all future installments of rent would cease. In this case the lease does not fix the rental value of the land for any period less than three years, and it was as appropriate to make provision for the rights of the parties upon its termination during that period as it would have been if all the rent was to be paid in one installment at the termination of the lease.

The particular form of the agreement evidently resulted from the fact that the clauses in question contemplated the termination or use by the irrigation works of a part only of the premises rather than a termination of the entire leasehold, although provision was also specifically made for the latter event. In the case of irrigation works, etc., the tenant's right to the possession of the acreage devoted to this use continued. The lease still remained in full force and effect as to the entire 403.4 acres. The allowance made as a credit on the rent is because the tenant has lost the beneficial use of that portion as an alfalfa farm. Hence, he is credited with the value of the use thereof on the rental. He is thus "reimbursed" or "compensated," to use the language of the lease.

The significance of this clause concerning the construction of irrigation works, etc., lies in the fact that there is no occasion or opportunity to consider the legal effect of a surrender or termination of the lease, and no chance to argue that the right to rental ceased, in whole or in part, with the whole or partial termination of the lease, for the lease is still in full force and effect, the tenant's beneficial use thereof has merely been impaired by the works in question. It would follow that a similar construction should be placed upon the termination clause, couched, as it is, in the same language. The only occasion for considering the clause with reference to the construction of irrigation works, etc., is the fact that this clause demonstrates that the continuance of a legal estate in the part as to which the lease is terminated or used is a false quantity in the case, the amount to be credited under the lease is the same in each event. Another consideration leads to the same conclusion. The termination clause deals with whole or partial termination. If partial, it is clear that the obligation still remains to pay the entire rent reserved in the lease, less the credit for which provision is therein made. If this is a correct con-

clusion there is no adequate reason for adopting a totally different construction where the whole estate is terminated. It is not reasonable to assume that the parties intended that the retention of a single acre, or part of an acre, for instance, should result in the tenant being required to pay all future installments of rent, amounting in this case to $10,818.18 and should pay no part of it if the last acre was also included in the notice of termination. The parties have a perfect right to fix any terms they can agree upon as the basis of adjustment upon the termination of the tenancy, and there is no reason to believe that they contemplated a wholly different adjustment of their rights in case of a partial and of a total termination. They might have done so, but there is nothing in the language of the lease under consideration which points to such a conclusion. It is apparent that the form of agreement resulted from the fact that the lease reserved a lump sum rental. For that reason it would have been difficult to frame a provision for reimbursement for partial loss which was not in the form of a credit upon the whole rental reserved where there was no apportionment of the rental to either time or acreage.

It is clear, then, we think, that the allowance to the tenant is the same per year per acre, whether the allowance is for 100 acres or for 403 acres or for the whole 403.4 acres, and that the lump sum rental was considered an obligation of the tenant in estimating the amount to be paid by the landlord upon the termination of the lease, whether whole or partial.

The appellant's claim is untenable that the above-quoted proviso should have read into it the words "due and unpaid," as to the rent upon which the allowance was to be credited. To add these words to the lease is beyond the power of the court or jury. Such a construction would defeat the claim of the plaintiff, for he here seeks to recover $20,000, not as a credit upon rent "due and unpaid," for there was no such rent, but by a judgment requiring the defendant to pay to him that amount. The amounts to be allowed to the tenant· upon termination bear no relation to the time or amount of the payment of the installment of rents. Apparently the amount to be paid the tenant the first year was fixed wholly with reference to the maturity of the crop on the land, and without reference to the pay-

ment or nonpayment of rent or of other considerations which will be presently mentioned. The tenant claims that if the notice terminating the lease had been effective October 31, 1917, instead of November 2, 1917, he would have wholly escaped the payment due November 1, 1917, of $3,286.30, because such rental would not have been due on October 31, 1917, and for that reason he complains somewhat that the landlord selected November 2d as the date of termination.

The payment or nonpayment of the rent must be an immaterial factor in the problem. It is not reasonable to believe that the parties intended that the selection of a date of termination with relation to a date of payment of an installment of rent should have any such result, thus making a difference of over ten dollars per acre per year ($4,257.11) between a termination of the lease October 31, 1918, and November 2, 1918. Such a construction is wholly inconsistent with the care with which the exact allowance per acre per year is regulated during the summer and autumn of 1917. If the lease is terminated in June or the first two weeks in July the rate is $20 an acre; from July 15 to August 15, 1917, it is $17.50 per acre, although a payment of $6.56 per acre ($2,646.27) is made July 25, 1917. The rate from October 1st to October 31st is $15 per acre and changes on that date to $17.50 and remains the same for the balance of the term, although a payment of $8.15 per acre ($3,286.30) is due the next day (November, 1917), and remains the same although three payments, amounting to about $5 per acre, and one of over $10 per acre, are made during this period. It is clear from the foregoing that the allowances to the tenant were made without reference to the dates or amounts of rent installments, which leads to the conclusion that the allowances were to be made against the whole rental reserved, which amount, except in the case of a termination of the whole lease, or nearly the whole lease, would be larger than the allowance.

While we have no doubt that this is the correct construction of the lease and this conclusion determines the case, we will nevertheless deal with some of the points of the parties, particularly as the appellant claims that the reimbursement clause is too uncertain to be enforced and the respondent claims that it is so ambiguous as to permit and require extraneous evidence for its interpretation. The ap-

pellant contends, and the respondent admits, that the construction of the lease is a question of law. "Of course," says respondent, "it is elementary that the construction of a contract is always a legal question or a question of law for the court. However, where parol evidence is required to clear up the meaning of ambiguous language, such evidence should be submitted to a jury which must determine the meaning of such ambiguous language. With the meaning of such language made clear by the jury, the court determines the legal effect of the writing. . . . All that was submitted to the jury's consideration was the meaning of the language 'per acre per year,' and 'credit on the rent.'" In this connection it should be observed that no such question was submitted to the jury. They were nowhere asked to construe the meaning of either of these terms or phrases. The instruction on which they returned a verdict is quoted above. The jury were thereby instructed to bring in a verdict for the plaintiff for $13,625.10, "If you find that the intention of the parties was that Mr. Harbinson should receive compensation for the balance of the term at the rate of," etc. The object of all construction is to arrive at the intention of the parties, so that the instruction submitted to the jury a question of law just as truly as if the court had used the equivalent phrase, "If you construe the contract to provide that Mr. Harbinson should receive," etc. This instruction and similar instructions were erroneous.

The respondent cites as justifying the instruction, section 66 of Blashfield on Instructions; *Coquillard* v. *Hovey,* 23 Neb. 622, 627 [8 Am. St. Rep. 114, 37 N. W. 479]; *Taylor* v. *McNutt,* 58 Tex. 71; *Chambers* v. *Ringstaff,* 69 Ala. 140, 146; *State* v. *Patterson,* 68 Me. 473, 475; *Cunningham* v. *Washburn,* 119 Mass. 224, 226; *T. E. Foley* v. *McKinley,* 114 Minn. 271 [131 N. W. 316, 318]; *Rapp* v. *H. Linebarger & Son,* 149 Iowa, 429 [128 N. W. 555]; *Durand* v. *Heney,* 33 Wash. 38 [73 Pac. 775]; *Vilas* v. *Bundy,* 106 Wis. 168 [81 N. W. 812]; *Alworth* v. *Gordon,* 81 Minn. 445 [84 N. W. 454]; *Hope* v. *The Maccabees,* 91 N. J. L. 148 [1 A. L. R. 455, 102 Atl. 689, 691]; *Paepcke & Leicht Lumber Co.* v. *Talley,* 106 Ark. 400 [153 S. W. 833, 836]; *Yost* v. *Silvers,* 138 Mo. App. 524 [119 S. W. 971, 973]; *Haskell* v. *Read,* 68 Neb. 107 [93 N. W. 997, 998]; *Vulcan Iron Works* v. *Electric Magnetic & Mining Co.,* 54 Ind. App. 28 [99

N. E. 429, 431] ; *Jones* v. *De Coursey,* 12 App. Div. 164, [42 N. Y. Supp. 578] ; *Arlington Heights Realty Co.* v. *Citizens' Ry. & Light Co.* (Tex. Civ. App.), 160 S. W. 1109.

[4]   We will not undertake to analyze these cases, for the reason that the fundamental principle involved is elementary, and is recognized in these decisions, namely, that the construction of a contract is always a matter of law for the court, no matter how ambiguous or uncertain or difficult its terms, and that the jury can only assist the court by determining disputed questions of fact. If the facts and circumstances to be considered in the interpretation of the contract are undisputed, there is nothing to submit to the jury and the court must direct a verdict in accordance with the construction placed on the contract by the court in the light of the admitted circumstances. On the other hand, if such circumstances are in dispute and the meaning of the contract is to be determined one way according to one view of the facts and another way in accordance with the other view of the facts, then the determination of the disputed fact must be left to the jury, but in no case can the proper construction of the contract be left to a jury. (*California W. D. Co.* v. *California M. O. Co.,* 178 Cal. 337, 341 [177 Pac. 849].) Any instruction that leaves more than this to a jury is erroneous. The dispute may be concerning the accepted meaning of trade or technical or colloquial terms in such cases, and in such cases only does the jury determine the meaning of the terms or language used in a contract. No such condition exists here. The terms of the contract are couched in ordinary language to be determined according to accepted usage, unless the circumstances of the parties and the entire contract show that the language used in the contract must receive a different or unusual construction.

In note to 12 L. R. A. 376 it is said: "The meaning of terms of art or business is for the jury. This is the rule where testimony is necessary to determine the meaning of the term; but when the meaning is determined, the construction of the contract with the meaning so determined is for the court." (Citing *Barnard* v. *Kellogg,* 77 U. S. (10 Wall.) 383 [19 L. Ed. 987], and other cases.) "The construction of a written contract is for the court alone, as soon as the true meaning of the words used and the sur-

rounding circumstances, if any, have been ascertained as facts, and it is the duty of the jury to take the construction from the court." (Citing *Levy* v. *Gadsby,* 7 U. S. (3 Cranch) 180 [2 L. Ed. 404], and other cases.)

"So where the meaning of words is affected by a custom or usage of trade, it is for the jury to say in what sense they were used by the parties." (1 Blashfield's Instructions to Juries, sec. 66, p. 133.) And this would be true where the contracts between the parties and the ordinary course of business contemplated by them in connection with the contract gave to the terms therein used a peculiar meaning, such, for instance, as in the case of *First Nat. Bank* v. *Bowers,* 141 Cal. 253 [74 Pac. 856], where the words "with B–L attached" were to be construed. It was admitted by the parties that the letters "B–L" meant a bill of lading, but the question in issue was what sort of a bill of lading was contemplated by the parties. It was contended on the one hand that the bill of lading intended was one which vested title to the oranges therein described in the bank and, on the other hand, that according to the course of business of the parties it meant any bill of lading accompanying a draft for oranges, even where the consignee was an agent of the consignor and regardless of whether or not the bank secured a lien upon the oranges by the bill of lading. The trial court having instructed the jury to bring in a verdict for the defendant it was held that the instruction was erroneous, for the reason that the court thereby determined that the defendant was only liable as guarantor for such drafts as had attached thereto bills of lading which conveyed title, whereas it was shown that according to the ordinary course of business as conducted for the two years covered by the guaranty it had been the custom of the Haight Fruit Company, whose drafts were guaranteed by the defendant, to use the form of draft by which the shipper retained control over the consigned fruit until delivered. Under these circumstances it was held that the jury should determine the sense in which the parties used the term "bill of lading attached." The main question considered by this court was whether or not the construction of the contract of guaranty by the trial court was correct and the court does not indicate the form of instructions by which the questions should be submitted to the jury. Upon the

second appeal in that case, 153 Cal. 95 [94 Pac. 422], it is said: "Upon appeal [the previous appeal] this court held that the wording of the guaranty was not so plain, unambiguous, and certain, as to have justified the court in refusing evidence explanatory of it."

The decision of the court in *First Nat. Bank* v. *Bowers, supra,* goes no further than to hold that where a technical phrase like "bill of lading" is used it can be properly left to a jury to determine the form and terms of the bill of lading intended by the parties as ascertained by their conduct and dealings with reference to bills of lading. This case is not authority for submitting to the jury the general question as to the intention of the parties to be ascertained by construing a contract, and expressions in the opinion which would so indicate cannot be considered as authority because juries are triers of the facts and not of the law and because of subsequent decisions in which the functions of the jury in matters of interpretation are determined. (*Estate of Donnellan,* 164 Cal. 14, 19 [127 Pac. 166, 168]; *Estate of Thomson,* 165 Cal. 290 [131 Pac. 1045]; *California W. D. Co.* v. *California M. O. Co., supra.*)

In *Estate of Donnellan, supra,* wherein the construction of a will was involved, it was said: "It is a fundamental and indisputable proposition that wherever doubt arises as to the meaning of a will, such doubt is resolved by construction and that construction is one of law—it is an application of legal rules governing construction either to the will alone or to properly admitted facts to explain what the testator meant by the doubtful language. In those cases where extrinsic evidence is permissible there may be a conflict in the extrinsic evidence itself, in which case the determination of that conflict results in a finding of pure fact. But when the facts are thus found, those facts do not solve the difficulty. They still are to be applied to the written directions of the will for the latter's construction, and that construction still remains a construction at law. In such cases where the evidence of the facts is in conflict, it is permissible for the court or for the jury, to find the facts and those findings, under firmly established principles, will not here be disturbed. But the application to the will itself of the facts found, admitted or established, presents a question of legal construction, which is

as purely a question of law as is a construction of the will without resort to extrinsic evidence. Therefore, if the facts have been found by the court upon conflicting evidence, this court, accepting the findings, will still review the construction of the court in probate and determine whether or not a wrong construction at law has been reached. If the facts are admitted, or established without conflict, the justness of the application which the court made of those facts in its construction will equally, as a legal proposition, be the subject of review. Again, it is fundamental that in all cases where extrinsic evidence is admissible to aid in expounding the will, the evidence is limited to this single purpose. It is considered, for the purpose of explaining and interpreting the language of the will, and is never permitted to show a different intent or a different object from that disclosed (though perhaps obscurely) by the language of the will itself.''

The same rules apply to interpretation of contracts. In *Estate of Thomson, supra* (page 296), it is said: ''Appellant contends that this [the question of construction] is really a conclusion of law, and that the determination of the scope and meaning of a contract is always a question of law. (*Estate of Donnellan,* 164 Cal. 14 [127 Pac. 166].) It is perfectly true that the construction of a contract, whether that construction is to be arrived at from a mere reading of the contract itself or from such reading aided by extrinsic evidence of circumstances and the like, is always a construction of law. But upon the other hand it is equally true that whether or not there is a sufficient consideration to support a contract is always a question of fact.''

In *California W. D. Co.* v. *California M. O. Co., supra,* it is said: ''The construction of the contract in the light of the real facts is a matter of law.'' In that case it was held improper to submit to the jury the question as to the intention of the parties in using the phrase ''into the oil sand'' contained in an oil drilling contract unless that phrase had some ''special local meaning, or customary construction, with reference to which the parties contracted.''

[5] It was error in this case to submit to the jury the question of the intention of the parties to be derived in part from the language of the contract and in part from extrinsic evidence.

Let us next consider the character of the extrinsic evidence relied upon to ascertain the proper construction of the contract. The situation, as stated by the respondent, is as follows:

"To aid the court and jury in construing this language, the witness Harbinson was permitted to testify to many extrinsic circumstances and matters which establish, and from which, as we have pointed out, the jury concluded, the intent of the parties was that the company was to compensate Harbinson for the *unexpired* term of the lease, deducting therefrom, however, such rent as might be *due*. . . . From the testimony of the witnesses Harbinson, Glide and Klingingsmith a conflict arose. There was testimony from which the court or jury could infer or conclude that Harbinson *was to be compensated so much per acre per year for the unexpired term*, and while the appellant has made no assertions as to what the testimony of Glide and Klingingsmith established, if we are correct in our presumption there was also testimony from which the court or jury might infer or conclude that Harbinson *was to be compensated only so much per acre, regardless of the length of the unexpired term*." (Italics ours.)

The evidence upon which this statement is based may be summarized as follows: Harbinson testified that he had seeded the land to alfalfa and that in January, 1917, frost destroyed the young alfalfa and that, therefore, he was compelled to reseed the land; that the reasonable expense of mowing, raking, plowing, disking, harrowing, clod-mashing, and seeding would be $4,826 and of reseeding $1,976, total $6,802, and that, therefore, his total expenditures for the first year were $12,734; that the anticipated return for alfalfa for the first year would be one ton, or $10 net per acre, while the second and third years the return would be six tons per acre, making a net return to the tenant of $48,360 for the last two years and a loss of $8,704 for the first year.

The appellant presented a witness who testified to a conversation between the plaintiff and the defendant's agent at the time the lease was being drawn to the effect that the amounts of $20, $17.50, $16, $15, and $17.50 were fixed with reference to the time of cutting the alfalfa and a crop of volunteer barley on the place during the year 1917. Noth-

ing was said in that conversation about the installments of rent falling due under the contract, or about the payments "per acre per year."

The reason advanced by respondent for the reception of the evidence offered on his behalf is thus stated by respondent's counsel: "But further than that, one of the circumstances that the court or the jury are entitled to in getting at the meaning of this lease is, what would be a fair compensation to Joe Harbinson when it was terminated."

[6] Assuming that such evidence was admissible, where was the conflicting testimony to be submitted to the jury? There was no dispute about the cost of improving the land or about the conversation. If either of these factors were applicable to the interpretation of the contract it was the duty of the court to make the application. Instead, the jury were instructed as follows:

"Gentlemen of the jury, you are instructed that you are entitled to take into consideration all the circumstances and facts as shown by the evidence and bearing upon the subject matter of this lease. The subject matter of the lease is the land, and in determining what compensation the plaintiff is entitled to, if any, for the termination of the lease, you are entitled to take into consideration the condition of the land at the time the lease was made, what would be necessary to do to the land to get it into a condition to get a stand of alfalfa, and also what would be necessary to produce on it a good stand of alfalfa. You are also instructed that you are entitled to take into consideration the amount of expense which the parties had in mind in so cultivating the land and getting a good stand of alfalfa. You are likewise entitled to take into consideration the amount of rent paid and to be paid, and also what would have been the value of the leasehold interest in the land to Mr. Harbinson with a good stand of alfalfa on it; and in determining what should be the amount of your verdict, if any, for the plaintiff, you are entitled to determine whether or not the parties entering into the lease took into consideration the expense of getting a stand of alfalfa, the amount of rent to be paid, and the value of the land in alfalfa for the portion of the time left after the lease should be terminated; and if in the light of these circumstances you believe that the intention of the parties was that if the lease

should be terminated Mr. Harbinson should receive $17.50 per acre per year for the three years, then you must find your verdict accordingly, and estimate and determine the amount. If, however, you determine that the intention of the parties was, in light of all the circumstances, that the amount of compensation should be $17.50 per acre for the remainder of the time from November 1st, 1917, to November, 1919, then you must render your verdict accordingly. In other words, you are instructed: . . . '' (Here follow hypothetical instructions, including that upon which the verdict was based.)

By this instruction the jury were directed in effect to place themselves in the position of the parties and to construe the contract, while this was exclusively the duty of the court. If the expense of planting the land to alfalfa was a legitimate matter to be considered, the evidence was before the court for that purpose. The fact is that the instructions virtually left the jury to determine whether $20,451.75 or $2,955.52 or $9,643.57, or nothing, was a fair compensation to the plaintiff under the circumstances, for the court expressed no opinion whatever on the subject of the proper interpretation of the contract. The fact is that the only difficulty in the case arises out of the extrinsic evidence, and the apparent hardship thus shown to result to the tenant from the termination of the lease on November 2, 1917. The instruction to the jury assumes, as does the entire presentation of the facts by the respondent, that the parties drew a contract, whose construction must be reasonable and just under all the circumstances, whereas the real question for determination is the meaning of the written agreement. The parties may not have anticipated, and evidently did not anticipate, every possible condition arising from a termination of the lease at different periods during the term of the lease. It is, of course, true that the lease should be given an interpretation which would work no obvious injustice to either party if the language used is susceptible of such an interpretation, but if not it must be construed according to its plain import. As we have said, the terms of the lease are plain and unambiguous. The effort of the jury to give to the lease an interpretation that would be just, based upon a speculation as to what the parties intended, in effect requires the landlord not only

to remit the rental for the last two years of the term but in addition to pay the tenant a larger amount for the land for that part of the term ($13,625) than the tenant had agreed to pay for that period. In other words, the landlord is required to pay the tenant $6,812.50 per year for two years for its land instead of receiving from the tenant $5,580.25 per year (if we assume that $5,932.57 it received is a fair rental for the first year), while if respondent's claim had been adopted the amount paid by the landlord for the last two years ($20,451.75) would exceed the entire rental reserved for the whole term. On the other hand, the interpretation we have placed on the lease means a loss to the tenant of $5,748.48. If we subtract from that loss the amount due to the unforeseen frost, it follows that the lease was so drawn that a loss of $3,772 was likely to result to the tenant by the termination of the lease on November 2, 1917. It is, therefore, not a reasonable agreement as applied to the particular date of termination, but it can be made reasonable only by making a new contract for the parties, which cannot properly be done, and should not be attempted under the guise of interpreting the lease. The extrinsic evidence introduced in this case did not aid in its interpretation or justify the conclusion of the court and jury.

This action was begun by the plaintiff on November 1, 1917, to restrain the defendant from taking possession of the land in pursuance of its notice of September 12, 1917, terminating the lease on November 2d. The basis of the action was the alleged insolvency of the defendant and the fact that the amounts due to the plaintiff under the lease were unpaid. The defendant answered and tendered $2,955.52, the amount it admitted to be due to the plaintiff. Thereafter on November 6, 1917, it was stipulated that the plaintiff should immediately surrender possession of the premises to the defendant; that defendant would pay $10,000 to the clerk of the court to secure to plaintiff any amount found due to him by the defendant, and that it be determined in the action what amount of money was due the plaintiff by reason of the termination of the lease. Thereafter the plaintiff filed an amended and supplemental complaint, January 8, 1919, and an amendment thereto January 14, 1919, the answer to which was filed during the trial.

The defendant now claims that the failure of the plaintiff to surrender possession on November 2, 1917, was a breach of the contract, which prevents any recovery by the plaintiff. In view of the stipulation surrendering possession on November 6, 1917, and the express agreement to submit the amount of compensation to determination in this case, it is clear that the breach, if any, was waived by the stipulation.

It is claimed that the plaintiff was estopped by the selection of a remedy inconsistent with a right to compensation, but in view of the stipulation that question cannot arise, for this action was by mutual agreement converted into one for compensation.

[7] The same thing is true in regard to the alleged failure of the plaintiff to prove performance of the terms of the lease which was alleged in the general terms permitted by the code. The claim is that plaintiff's refusal to surrender the possession of the premises on November 2, 1917, was a breach, but as we have said, this was waived by the stipulation.

[8] Defendant claims that the lease was procured by fraud and that the verdict in that regard was against the uncontradicted evidence. The fraud is alleged to consist in representation by the plaintiff to the defendant that he was the lessee, when, in truth and in fact, he was acting for a corporation composed of himself and his brothers. The lease was made to him individually and the corporation was not formed until after the lease was executed, so there is no merit in the claim that there was no evidence to support the verdict against fraud.

What has been said disposes of other points raised by the appellant. The respondent is entitled to the sum tendered by the appellant, and should have interest thereon and costs, because the appellant virtually withdrew its tender when it advanced the claim that the plaintiff should recover nothing.

The trial court is directed to modify its judgment by reducing the same to the amount of $2,955.52, with interest from November 2, 1917, at the rate of seven per cent per annum, plus the plaintiff's costs of the first trial. Appellant to have his costs on appeal deducted from the judgment.

Lennon, J., Waste, J., Lawlor, J., Shaw, C. J., and Shurtleff, J., concurred.

SLOANE, J., Dissenting.—I dissent. In my judgment the proviso for paying lessee compensation for terminating his lease two years before the expiration of the term, "by credit on the rent," is ambiguous as to what rents were referred to in the use of that expression. It was an ambiguity which could only be resolved by a consideration of all the conditions and circumstances surrounding the transaction in order to determine in what sense the word "rent" was used, whether as referring to rents "due and unpaid" for the expired part of the term as found by the verdict of the jury, or rent "reserved in the lease" as determined by the majority opinion on this appeal.

The facts developed in evidence tending to throw light upon the interpretation which should be given to the use of the word "rent" in this connection, while established by unconflicting testimony, give rise to conflicting inferences; that is, some of the conditions and transactions suggest that the words "credit on the rent" were used in one sense, and some that they were used in the other. Under these circumstances the question was clearly one of fact for the jury.

The authorities cited in the opinion of Mr. Justice Wilbur to the point that the construction of a contract is always a question of law for the court, no matter how ambiguous its language, if the extraneous evidence explaining the ambiguity is not conflicting, are unquestioned. It is equally as well settled, however, by these authorities and others, that where the evidence is conflicting it becomes a question of fact for the jury, not to construe the contract, but to determine what meaning the parties themselves attached to the ambiguous terms, and it is also recognized that such conflict may arise from different inferences which may be drawn from undisputed facts, as well as from a dispute as to the facts themselves. (*T. E. Foley Co.* v. *McKinley,* 114 Minn. 271 [131 N. W. 316]; *Rapp* v. *Linebarger & Son,* 149 Iowa, 429 [128 N. W. 555]; *Durand* v. *Heney,* 33 Wash. 38 [73 Pac. 775].)

*First Nat. Bank* v. *Bowers,* 141 Cal. 253 [74 Pac. 856], is a case in point, and closely parallel to the one before us. There the ambiguity arose in the use of the term "bill of lading attached." As the main opinion states, in reviewing the decision, "the question in issue was what sort of a bill

of lading was contemplated by the parties.'' It was contended on the one hand that the bill of lading intended was one which vested title in certain oranges, and, on the other hand, that it meant any bill of lading accompanying a draft for oranges regardless of whether the consignee secured a lien by the bill. The matter was to be determined by evidence as to the custom existing in similar transactions. The court says, quoting *Thompson* v. *McKay*, 41 Cal. 228: " 'The rule is well established that, in construing doubtful instruments they must be interpreted in the light of the surrounding circumstances. After ascertaining the relation of the contracting parties to each other, and the subject matter of the contract, the court will, if possible, so construe the instrument, however inartificially drawn, as to give effect to the intention of the parties, providing it can be done without disregarding the language of the instrument when all its parts are considered.' . . . The purpose to be subserved by this rule is to place the court, or jury, in the position of the parties at the time the contract was made, and enable it to intelligently interpret the language used by them. . . . Under these principles the plaintiff had a right to have submitted to the jury the question of what was intended, understood, and meant by the parties in the use of the term, 'bill of lading attached.' ''

In the instant case the opposing parties contend, on the one hand, that in using the term "credit on the rent" the parties had in mind such rents as might be due and unpaid when the lease was terminated; on the other, that the rent referred to was. the term "rent" stipulated in the lease, which remained unpaid covering the remaining two years of the term for which the lease had been canceled.

It may be conceded that it is possible from certain expressions of the lease contract to give the interpretation to the disputed clause contended for by appellant, without recourse to extraneous evidence. But, on the other hand, there are other declarations that are inconsistent with such interpretation.

The lessor contracts to *compensate* the lessee for the loss of the remainder of the term, in case of an exercise of the option to terminate the lease, and the stipulated damages for the two years of the unexpired term in this instance was $13,625.

When the lessor exercised his option to terminate the lease as to the entire premises, the obligation of the lessee to pay future rentals was also terminated.  It is conceded that all accrued rents had been paid.  If the contract for damages had stopped at the unqualified agreement to compensate the lessee in the sum of $13,625 for the loss of the unexpired term, there would have been no question of the latter's right to recover that amount, without deducting therefrom over $10,000 of rent that he did not owe.  Is it a reasonable interpretation of the provision that this payment should be made by a "credit on the rent," that the parties thereby intended to bind the lessee to account for rents, which, under the terms of the contract, were not due or owing?

Under this construction of the contract it will be seen by a little computation that had the lease been terminated six months earlier, or six months later, the stipulated compensation would have been entirely canceled by the unexpired term rental, and all the lessee would have received from the agreement to compensate him would have been a release from obligation to pay rent on the terminated leasehold, which release he already had by virtue of the voluntary cancellation of the lease by his landlord.

The conditions of the termination of the lease as it occurred here left a balance due the lessee over the unpaid term lease of $2,955.52, which, under the ruling of the majority opinion, is all the compensation he will receive for the unexpired two years of his valuable leasehold.

When we consider, under the extraneous evidence, together with other significant facts, that the parties to the lease in framing this contract had under consideration the amount of remuneration which would compensate the lessee for the loss of the last two years of a three years' lease upon 400 acres of land which was to be planted to alfalfa the first year, at a probable net loss for that season, and contemplated matured crops for the last two years which were expected to net to the lessee many thousands of dollars the second and third years, it is a violent interpretation which accepts the one of two meanings of the term used, which would leave the tenant with only a nominal compensation for his loss.

It is argued that if the unpaid term rent was not the thing referred to in this proviso, the reference to rent could have no application as all accrued rents were presumed to be, and had actually been, paid before the termination of the lease. The option, however, reserved by the lessor to so cancel the lease extended to all or any part of the acreage, and it may well have been within the contemplation of the parties that such option would only be exercised as to part of the land, leaving accruing rents on the remainder to be applied on the stipulated damages.

I think the interpretation adopted by the jury was consistent with the conditions shown in evidence and supports the verdict for $13,625.

When the lessor agreed to "compensate" the lessee at a fixed rate per acre per year for the loss of the canceled two years of his leasehold it agreed to give him something of value for surrendering the remainder of his term. There is no compensation in merely granting to the lessee the privilege of paying himself by applying to his claim rentals which he no longer owes, on lands which he no longer possesses.

The verdict of the jury is based upon a rational commonsense interpretation of the intent of the parties and supports the only construction of the contract consistent with justice and fair dealing.

In the language of Justice Shaw in *Stein* v. *Archibald,* 151 Cal. 223 [90 Pac. 537]: "It is a well-settled principle applicable to the construction of contracts, that where one construction would make the contract unreasonable and unfair, or unusual and extraordinary, and another construction equally consistent with the language would make it reasonable, fair and just, that the latter construction is the one which must be adopted."

It is true that the question of fact as to the interpretation of the ambiguous language of this lease was not submitted to the jury under an appropriate instruction, and instructions were given which, it is claimed, left with the jury the construction of the contract. But even so, this error would only call for a reversal and new trial and should not be followed by a judgment of this court taking

the interpretation of the controverted language from the consideration of a jury.

Rehearing denied.

All the Justices concurred.

Shurtleff, J., was absent and Richards, J., *pro tem.*, was acting.