**Ralph W. CATON d/b/a Caton Sales Company, Plaintiff–Appellant,**

v.

**LEACH CORPORATION, Defendant–Appellee.**

No. 89–1168.

United States Court of Appeals, Fifth Circuit.

March 21, 1990.

Rehearing Denied April 23, 1990.

John M. Phalen, Jr., Joseph G. Chumlea, Phalen, Chumlea & McQuality, Dallas, Tex., for plaintiff-appellant.

Susan L. Karamanian, Locke, Purnell, Rain & Harrell, Dallas, Tex., for defendant-appellee.

Before GOLDBERG, POLITZ, and JONES, Circuit Judges:

EDITH H. JONES, Circuit Judge:

Ralph Caton sued Leach Corporation, which had terminated him after 22 years as an employee and a sales representative, to recover damages for breach of contract and implied contract, wrongful discharge, and amounts allegedly owed as restitution. The district court granted Leach Corporation's motion for summary judgment. We reverse in part and affirm in part.

## FACTS

For purposes of reviewing the grant of summary judgment, we must accept the evidence of the non-movant, and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Leach Corporation ("Leach") manufactures electronic and mechanical products for use in the aerospace industry. Leach marketed and sold its products for many years throughout the country through local sales representatives such as Ralph Caton ("Caton").

From 1963 until June 15, 1985, Caton worked for Leach in several capacities. During his first ten years, Caton solicited sales in Texas for Leach as a company employee, including serving as district sales manager. In 1973, Caton relinquished his employee status to become an independent sales representative for Leach. Caton eventually became Leach's exclusive representative to solicit relay switch sales in Texas.

In July 1983, Leach and Caton executed a sales representative agreement which defined the parties' relationship through provisions that addressed Caton's responsibilities, sales territory, and compensation structure. The 1983 agreement recognized that Caton was to be compensated for his services on a commission basis, and its pertinent terms will be described later.

For many years, Caton actively participated in the research, design and marketing of relay switches that Leach sold to General Dynamics for the F–16 aircraft. During 1984, Caton notified Leach that General Dynamics expected a large government order of F–16 aircraft ("Multi–Year Buy"), for which General Dynamics would need relay switches. Fulfilling his sales representative responsibilities, Caton maintained and solidified Leach's position as a General Dynamics supplier.

By letter dated May 14, 1985, however, Leach notified Caton that the sales representative agreement would be terminated thirty days later.[1] The letter was hand

---

1. Caton also alleges that Leach Control Products Division breached an additional Sales Repre-

delivered to Caton by Steve Whitcomb, Leach's National Sales Manager, at a hotel near Fort Worth, Texas.

By a remarkable coincidence, the termination occurred after Leach had received quotation requests from General Dynamics regarding relay switches for the Multi–Year Buy and after Caton prophesied the success of Leach's efforts on this contract. A table submitted in evidence indicates that Leach had bid to supply over $12,000,000 of relay equipment by June 15, 1985.[2] Caton contends that Leach was awarded $4.9 million in relay orders by September 6, 1985 and eventually received $8.6 million of relay business.

Although the reasons for Caton's termination are, naturally, disputed, Caton has directed us to evidence suggesting that he contributed significantly to obtaining the General Dynamics contract. Caton testified in deposition regarding a conversation on February 27, 1985, with Whitcomb following their joint visit to the General Dynamics plant in Fort Worth. Against Whitcomb's denial, Caton asserts that Whitcomb referred to the General Dynamics Multi–Year Buy, stating "when we book this, we are going to have to pay you a quarter million dollars of commissions, ..." In a letter dated March 6, 1985, Whitcomb criticized Caton for problems with Bell, but also commended Caton for developing the *"obvious rapport and good relations with G.D. [General Dynamics], T.I. and Electro Space"*. A later Whitcomb memo discussing possible changes in sales personnel acknowledged that Caton could potentially cost Leach $300,000 in commissions during fiscal year 1986, the time for the Multi–Year Buy. Whitcomb also conceded by deposition testimony that in early April when the termination letter was prepared, Leach was optimistic about

procuring $3 to $4 million of relay orders from General Dynamics.

The district court granted summary judgment in favor of Leach on the ground that the agreement gave Leach the express right to terminate the parties' relationship upon 30 days' notice. On appeal, we must determine whether any genuine issue of material fact arises from the evidence to support any of Caton's proffered theories for relief.

## I.

## CHOICE OF LAW

Either the law of California or Texas applies to Caton's various claims. Although the parties agree that the choice of law clause contained in Caton's contract governs the choice of law analysis, our role as a federal court sitting in diversity requires application of the choice of law rules of the forum. *See Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975); *Stuart v. Spademan*, 772 F.2d 1185, 1195 (5th Cir. 1985). Accordingly, we decide which law governs according to Texas law.

The parties' choice of law clause provides that: "[t]his Agreement shall be construed under the laws of the State of California." Texas choice of law principles give effect to choice of law clauses if the law chosen by the parties has a reasonable relationship with the parties and the chosen state, and the law of the chosen state is not contrary to a fundamental policy of the state. *Desantis v. Wackenhut Corp.*, 31 Tex.S.Ct.J. 616, 618, —— S.W.2d.——, —— (July 13, 1988) (motion for reh. pending). In *Desantis*, the Texas Supreme Court adopted the rule of Section 187 of the Restatement (Second) of Conflict of Laws. *See id.* at —— (discussing Section 187(2)).

sentative Agreement which contains the same contract language as relevant to the Relay Division dispute and addressed Caton's sale of control products. This agreement was terminated by Control Products Division on May 14, 1985.

**2.** A summary of requests for quotation and orders from General Dynamics was prepared by Caton's counsel from discovery and was attached as an exhibit to Caton's response to Leach's motion for summary judgment.

Section 187(1) allows the parties to incorporate by reference the laws of a forum to determine issues that could have been resolved by explicit agreement, such as "rules relating to construction" of an agreement. *See* Restatement (Second) of Conflict of Laws § 187(1) comment c (Supp. 1988). *See also* Scoles & Hay, Conflict of Laws § 18.3, at 637 (1984) (choice of law for construing terms·of contract is not restricted). We will give effect to the parties' determination that their agreement be construed under California law. Likewise, Caton's claim for relief under the implied contractual covenant of good faith depends on the construction of the contract under California law, and California law will govern this claim.

 The parties' narrow choice of law clause[3] does not address the entirety of the parties' relationship, however, and hence does not end our inquiry. Caton's other claims for relief involve the tort duty of good faith and fair dealing and a claim for restitution under quantum meruit, and, as such, do not arise out of the contract. Because the choice of law clause does not address the general rights and liabilities of the parties, we must return to Texas choice of law rules to determine which law applies. In Texas, where the parties have not agreed to the application of law to a particular issue, "the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue." *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984); *see also* Restatement (Second) of Conflict of Laws § 145(1) (1971) (most significant relationship test for tort liability). Section 145(2) provides the relevant contacts for analyzing which state has the most significant relationship to the parties and the occurrence "under the principles stated in Section 6." Restatement (Second) of Conflict of Laws § 145.

Caton resides in Texas, served Leach in Texas by soliciting sales from companies in Texas, and was terminated by Leach in Texas. Leach is a Delaware corporation, which has its principal place of business in California. Caton and Leach agree that Texas law should be applied to Caton's claims that arise independently from the sales representative agreement. Finally, Texas has a significant interest in remedying civil injury to Texas citizens through tort liability and also in defining the outer limits of tort liability. Therefore, Caton's wrongful discharge claim based on breach of the alleged tort duty of good faith should be governed by Texas law.

We will also apply the most significant relationship test to determine which state's law applies to Caton's claim for restitution. *Cf. Duncan*, 665 S.W.2d at 421. Section 221 of the Second Restatement applies this method to determine the applicable law for restitution claims and guides the analysis. Again, the law of Texas takes precedence, based upon the factors just recited and upon two other critical facts. The benefit, if any, from Caton's efforts with General Dynamics was conferred in Texas and received by Leach in Texas. Texas has a distinct interest in applying its restitution policy to a course of action that enriched Leach in Texas at the expense of a Texas citizen.

## II.

### THE CONTRACT

 The trial court held succinctly that because the sales representative agreement allowed for Caton's termination at will, on thirty days notice, Caton had no claim for commissions. We view the matter as more complex, based on a careful review of the contract. As was just stated, we shall construe the sales agreement according to California law.

The relevant portions of the sales agreement are these:

8C. *Payment of Commissions:*

---

**3.** In contrast to broad clauses, which choose a particular state's law to "govern, construe and enforce all of the rights and duties of the parties arising from or relating in any way to the sub- ject matter of this contract," the instant clause denotes only that California law will be applied to "construe" the contract.

No commission shall be earned until shipment is made. Commissions shall be payable within twenty (20) days after the close of the Company's monthly accounting period on all shipments made during the prior monthly accounting period. Payment of commissions due shall be subject to the following deductions, if applicable: ....

8D. *Allocation of Commissions Between Engineering Specification, Procurement of Order and Post–Delivery Service:*

The Company and Representative recognize that the commissions paid to Representative are intended to compensate Representative for engineering specification, obtaining orders and for performing service on the Products for the customer after the customer receives the Products. One-third (⅓) of the commission shall be allocable to each of the following: (1) engineering specification influence, (2) procurement, and (3) post-delivery service. In the event Representative performs less than all three functions (such as post-delivery service only), then Representative shall be entitled to receive only that portion or portions of the applicable commission allocable to the function or functions performed by Representative.

17. *Termination:*

This Agreement may be terminated by either party, without cause, upon thirty (30) days prior written notice to the other party.

In the event either party breaches the terms of this Agreement, the party not in default may terminate this Agreement immediately by giving the party in default written notice of such termination regardless of whether or not such default is one that may be cured by the payment of a sum due or the performance of any other act.

This Agreement shall automatically terminate if either party elects to discontinue further operations in the type of business contemplated by this Agreement, or a voluntary or involuntary petition in bankruptcy is filed by or against either party, or either party becomes subject to a receivership, assignment for the benefit of creditors, or other proceedings of like nature.

Upon any termination Representative shall be entitled to all or the allocable portion of commission on any orders for shipment to his Territory accepted by the Company prior to the date of termination, payable when the Company receives payment from its customers.

The termination provision creates an at-will arrangement which either party may end upon 30 days notice, without cause. The termination provision entitles the representative "upon any termination" to all or the allocable portion of certain commissions. Leach contends that this provision defines Caton's commission rights at termination and limits commissions to orders accepted by the Company prior to the date of termination. The construction urged by Leach would cut off Caton's right to commissions on orders that Caton may have procured or provided engineering services for but that were not accepted by the company before his termination.

Significantly, however, Caton's right to receive all or an allocable portion of the applicable commission also appears in an earlier part of the agreement. *See* 8D, *supra.* This Allocation provision states that the commissions "are intended to compensate" the sales representative for three separate phases of his work: engineering services, pre-delivery customer solicitation and post-delivery customer service. Furthermore, the language that "Representative shall be entitled to receive" the portion of commission allocable to the functions performed suggests that the representative acquires rights upon performance of each of these types of duties. The Allocation provision mandates apportionment of the commission if more than one sales representative or the company itself participates in a sale.

It is not clear to us that paragraph 17, given its precise cross-reference to Caton's rights acquired by performance under

paragraph 8D, intended to deprive Caton of such rights by the simple expedient of the timing of his termination.[4] One might well ask whether Leach would take the same stance regarding construction of the contract if Caton had died or quit under friendly circumstances. We find these provisions ambiguous and not dispositive of the question of Caton's right to at least an allocable portion of the commissions from the General Dynamics Multi–Year Buy after his termination.

The language in the termination provision also seems to conflict with the specification in paragraph 8C of the time for payment of commission. Paragraph 8C states that "No commission shall be earned until shipment is made," while paragraph 17 provides that orders need to be accepted by Leach before termination in order to trigger commissions. It is unclear what impact, if any, these provisions have on the timing or allocation of commissions to a salesman who is terminated.

The California Supreme Court has articulated several rules of construction relevant to this dispute. In *Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal.2d 751, 128 P.2d 665, 671 (Cal.1942), as in this case, separate contractual provisions applied together created an ambiguity on the face of the contract. The court stated that: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." 20 Cal.2d at 759–61, 128 P.2d at 671 (citation omitted). Furthermore, the interpretation of specific terms in a particular case "is controlled by the context of the writing, and the whole instrument must be examined." *Id.* Finally, the court noted that:

> Forfeitures are not favored by the courts, and, if an agreement can be reasonably interpreted so as to avoid a forfeiture, it is the duty of the court to avoid it. The burden is upon the party

claiming a forfeiture to show that such was the unmistakable intention of the instrument. A contract is not to be construed to provide a forfeiture unless no other interpretation is possible.

*Universal Sales Corp.*, 20 Cal.2d at 771–72, 128 P.2d at 677 (citations omitted).[5]

■■■ In *Universal Sales Corp.*, the California Supreme Court affirmed the trial court's consideration of extrinsic evidence to construe ambiguous contract provisions. 20 Cal.2d at 759, 772, 128 P.2d at 671, 677. The trial court considered the circumstances surrounding the making and performance of the agreement to arrive at the parties' intent. 20 Cal.2d at 759–63, 128 P.2d at 671–72. Where a contractual provision is ambiguous or uncertain, the trial court has the duty to "construe it *after a full opportunity afforded all the parties in the case to produce evidence of the facts, circumstances, and conditions surrounding its execution and the conduct of the parties relative thereto.*" *Walsh v. Walsh*, 18 Cal.2d 439, 116 P.2d 62, 65 (Cal.1941) (emphasis in original). The parties' intended meaning for an ambiguous provision involves a question of fact. *Id.* If the extrinsic evidence admitted for the interpretation of the contract is undisputed, the court can construe the contract in light of the extrinsic evidence. *See O'Connor v. West Sacramento Co.*, 189 Cal. 7, 207 P. 527, 532 (Cal.1922). "[T]he construction of a contract is always a matter of law for the court, no matter how ambiguous or uncertain or difficult its terms, and the jury can only assist the court by determining disputed questions of fact." *Id.*

Consistent with these rules, the district court should admit evidence of the parties' intent as to the ambiguous provisions. This may be derived from evidence of negotiations, "the circumstances surrounding the contract's execution" and "the parties' conduct subsequent to contract formation." *Laborers Health & Welfare Trust Fund v.*

---

**4.** Leach relies heavily upon Caton's deposition testimony, which allegedly agrees with Leach's proffered construction of paragraph 17D. The trial court could not have relied on such testimony, for its decision refers only to the contractual provision, and the trial court did not ascertain the ambiguity that troubles us. The impact

of this deposition testimony may be better evaluated after development of the record.

**5.** *Compare Coleman v. Graybar Elec. Co.*, 195 F.2d 374 (5th Cir.1952) (applying general contract law absent specific Texas authority).

*Kaufman & Broad*, 707 F.2d 412, 418 (9th Cir.1983) (citations omitted). The court should determine whether the parties intended for Caton to acquire rights or benefits upon the performance of engineering or procurement services and whether the parties intended for such rights, if any, to be eliminated if orders, although expected to be received, were not accepted by Leach until after the representative's termination. The court should undertake this construction in light of California's "settled policy of the law not to enforce a forfeiture in the absence of a clear statement to that effect." *Universal Sales Corp.*, 20 Cal.2d at 771–72, 128 P.2d at 677. "The burden is upon the party claiming a forfeiture to show that such was the unmistakable intention of the instrument." *Id.* In the context of this case, a forfeiture of commission rights, not the employment itself, is at issue.

To facilitate the court's actions on remand, we anticipate that extrinsic evidence will lead to the following possible conclusions: (a) the parties clearly intended a sales representative to be entitled to allocation of his commission for work performed notwithstanding termination; or (b) the parties did not specifically envision whether a sales representative would be entitled to an allocable commission if he performed work on orders which were anticipated to be accepted by Leach but were not actually accepted prior to his termination; or (c) the parties clearly intended that a sales representative must remain on Leach's payroll until it accepted an order before he could claim any allocable portion of commissions. If the court or trier of fact adopt either of the first two propositions, Caton will prevail in his construction of the contract, because of California's requirement that a

forfeiture be expressed with unmistakable clarity. *See Universal Sales Corp.*, 20 Cal.2d at 771–72, 128 P.2d at 677.[6] In such event, the trier of fact must then determine, guided by paragraph 8D, what portion of the commission was earned by Caton, and to what parts of the Multi–Year Buy Caton's services related.

## III.

## BREACH OF IMPLIED COVENANT OF GOOD FAITH

The next issue is whether the district court erred in granting summary judgment against Caton's claim that Leach violated an implied covenant of good faith in his sales representative agreement. The district court determined that because the agreement was terminable on 30 days notice, Caton could not recover on this claim. Perceiving at least part of Caton's argument to reach the question of his right to receive compensation for work he performed toward the Multi–Year Buy, which was denied only because he was fired shortly before Leach accepted orders for those sales, we disagree.

The California courts recognize that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 227, 765 P.2d 373 (Cal.1988). This good faith obligation applies to effectuate the promises, terms, and purposes of the parties' agreement. 47 Cal.3d at 683, 690, 254 Cal.Rptr. at 227, 232, 765 P.2d at 389, 394.[7] We agree with the district court that the implied good faith covenant may not obliterate rights, such as at-will termination, expressly embodied in a written contract. "Because the

---

**6.** By comparison with the contract in this case, other contracts construed by California courts contained more explicit forfeiture terms. *See, e.g., Division of Labor Standards Enforcement v. Bullis*, 72 Cal.App.3d Supp. 52, 140 Cal.Rptr. 267, 269 (Cal.App.Dep't.Super.Ct.1977) (court found unambiguous, a provision that stated: "No commission, bonuses or contest prices shall be payable to a salesman under any conditions for any unit not actually delivered and licensed prior to termination of employment."). *See also Balzer/Wolf Assoc. v. Parlex Corp.*, 753 F.2d 771, 772 (9th Cir.1985) (contract provided that after

termination, "the Representative shall be under no further obligation to Parlex, and Parlex shall be under no further obligation to the Representative, except that Parlex shall pay commissions earned on any order within the terms of the agreement which was accepted" by Parlex before termination) (court applied Massachusetts law).

**7.** Leach half-heartedly contends that this implied covenant extends only to employment contracts and is not applicable to Caton's sales representative agreement, in which employment

implied covenant protects only the parties' right to receive the benefit of their agreement, and, in an at-will relationship there is no agreement to terminate only for good cause, the implied covenant standing alone cannot be read to impose such a duty." 47 Cal.3d at 698 n. 39, 254 Cal.Rptr. at 238 n. 39, 765 P.2d at 400 n. 39.

■ Nevertheless, where obligations are imposed and rights are created by a contract, the implied covenant of good faith protects the parties' expectations to receive the contractual benefits. 47 Cal.3d at 682–85, 254 Cal.Rptr. at 227–28, 765 P.2d at 389. Caton contends that Leach acted in bad faith in denying him benefits, *i.e.* an allocable share of commissions, to which he was entitled under the agreement.

■ If the entitlement language in paragraph 8D created rights or benefits for a sales representative upon the performance of specified services, then Caton may be able to recover damages for breach of California's implied covenant. In other words, even if the parties clearly intended for post-termination acceptance of orders to eliminate a right to commissions, fact questions remain whether Leach breached the implied covenant of good faith and fair dealing by accepting Caton's engineering and procurement services on the Multi–Year Buy while maneuvering to terminate Caton and cut off his right to receive an allocated commission for his work. The breach of the covenant would be limited to Leach's actions in accepting services without ever intending to compensate Caton, rather than for his termination. Caton's recovery for a breach of the implied covenant of good faith would be restricted to a contract measure. *Foley,* 47 Cal.3d at 682–85, 697–99, 254 Cal.Rptr. at 227–28, 238, 765 P.2d at 389–90, 400. In this case, contract damages would be based on an allocation of commissions under paragraph 8D. This theory of liability would not restrict the parties' contractual right to at-will termination of the agreement, but would nevertheless "protect the express covenants or promises of the contract." *Foley,* 47 Cal.Rptr. at 689–90, 254 Cal.Rptr. at

was specifically disavowed in favor of an independent contractor relationship. *Foley* patently

232, 765 P.2d at 394. Moreover, this theory does not undermine the provision in paragraph 17D, if it is found to eliminate Caton's right to an allocable share of commissions based on the timing of his termination.

### IV.

### QUANTUM MERUIT

The district court also determined that Caton could not create an issue of material fact in his claim for restitution because of the existence of the sales agreement. We are constrained to agree.

■ Caton has characterized his request for restitution pursuant to the "theories" of quantum meruit and unjust enrichment. Under Texas law, the remedy of restitution is available through the theory of quantum meruit. *See* 64 Tex.Jur.3d Restitution § 3, at 814–15 (1989). The quantum meruit theory of recovery "is based on implied contract in a special sense, and is quasi-contractual rather than truly contractual." *Id.* The quantum meruit count is founded upon a theory of unjust enrichment, which "characterizes the result of failure to make restitution of benefits received under such circumstances as to give rise to implied or quasi-contract to repay." *Id.* at 829; *see also La Chance v. Hollenbeck,* 695 S.W.2d 618, 620 (Tex. App.—Austin 1985, writ ref'd n.r.e.). The right to recover in quantum meruit is based upon a promise implied by law to pay for beneficial services rendered and knowingly accepted. *Black Lake Pipe Line Co. v. Union Construction Co.,* 538 S.W.2d 80, 86 (Tex.1976). If the work in question is covered by an express contract, there can be no recovery in quantum meruit. 538 S.W.2d at 86; *Woodard v. Southwest States, Inc.,* 384 S.W.2d 674, 675 (Tex. 1964); *Teague v. Edwards,* 159 Tex. 94, 315 S.W.2d 950, 952 (1958); *General Homes, Inc. v. Denison,* 625 S.W.2d 794, 796 (Tex. App.—Houston [14th Dis.] 1981, no writ).

■ Our decision is governed by *Mitsubishi Aircraft Int'l, Inc. v. Maurer,* 675 S.W.2d 286 (Tex.App.—Dallas 1984, no writ), in which the Texas court held against

extends to all contracts, even though it was an employment case.

a commissioned sales representative whose argument closely parallels that of Caton. The plaintiff's commission agreement allowed payment after Mitsubishi received a certain portion of an aircraft sales price from the purchaser. The plaintiff was terminated after he had negotiated several sales, but before the triggering date in the commission agreement. The court held that because the agreement covered his right to commissions, no quantum meruit claim could be made. The court also rejected the plaintiff's contention as to the applicability of quantum meruit if, by its wrongful action, an employer prevented the employee's performance under the contract. The court held:

> In the present case Maurer was an employee at-will. Mitsubishi, therefore, had the right to terminate him at any time, for any reason.... *Thus when Mitsubishi terminated Maurer it broke no contract. Consequently, there was no wrongful discharge and no breach of contract preventing Maurer's completion of performance.* Therefore, we conclude that Maurer's wrongful discharge and prevention arguments fail to establish in the present case any limitations or exceptions to the rule that if the work in question is covered by an express contract, there can be no recovery in quantum meruit.

675 S.W.2d at 289 (emphasis added).

Perceiving no reasonable distinction between *Mitsubishi* and this case, we are bound to deny Caton relief in quantum meruit.

### V.

### TORT OF WRONGFUL DISCHARGE

■ The district court held that the tort of wrongful discharge does not provide a viable theory of relief in the context of the at will contractual relationship and granted summary judgment against Caton's tort claim. We agree.

The Texas courts have refrained from imposing a contractual covenant of good faith and fair dealing in every contract. *English v. Fischer*, 660 S.W.2d 521, 522 (Tex.1983) (court refused to adopt implied contractual covenant of good faith that nei-

ther party will do anything which injures the right of the other party to receive the benefits of the agreement); *see also Arnold v. National County Mutual Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987). Rather, the Texas Supreme Court has recognized a tort duty of good faith and fair dealing, but has limited its application to distinct situations. *See Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 212–13 (Tex.1988) (special relationship exists between workers' compensation carrier and claimant, upon which to impose tort duty of good faith).

The Texas courts have injected the tort duty of good faith in discrete, special relationships, earmarked by specific characteristics including: long standing relations, an imbalance of bargaining power, and significant trust and confidence shared by the parties. *Aranda*, 748 S.W.2d at 212–13 (compensation carrier occupies position of control over dependent employee, who places trust in carrier); *Arnold*, 725 S.W.2d at 167 (special relationship between insurer and insured is based on unequal bargaining power and insurer's position of control); *see also Lovell v. Western Nat'l Life Ins. Co.*, 754 S.W.2d 298, 302–03 (Tex. App.—Amarillo 1988, writ denied); *English*, 660 S.W.2d at 524 (Spears, J., concurring) (special relationship arises from "element of trust necessary to accomplish the goals of the undertaking, or" "an imbalance of bargaining power"). The Texas appellate courts, as yet, have not found the employment relationship to present an adequate basis upon which to impose the duty of good faith.

In *McClendon v. Ingersoll–Rand Co.*, 757 S.W.2d 816, 819 (Tex.App.—Houston [14th Dist.] 1988), *rev'd on other grounds*, 779 S.W.2d 69, 71 (Tex.1989), the intermediate appellate court rejected an at-will employee's wrongful discharge claim. The employee had sold equipment for his employer for nine years under an at-will arrangement. The employee, who was paid on a commission basis, maintained that he was fired just before his retirement benefits vested and after he helped procure a large order with a buyer. The court held that the employment relationship did not justify the tort duty, stating:

If we were to recognize the employer-employee relationship as "special", that would be tantamount to putting every commercial contract under the umbrella of *Arnold:* vendor-purchaser, lessor-lessee, lender-borrower. Such an extension would undermine the very foundation of *Arnold* by denying that an insurance relationship is deserving of any special protection: it would in effect repudiate the Court's rationale to confuse the exceptional with the everyday.

*Id.* at 819–20. The Texas Supreme Court reversed the appellate court on other grounds, holding that an at will employee states a cause of action for wrongful discharge where plaintiff proves that the "principal reason for his termination was the employer's desire to avoid contributing to or paying [pension] benefits...." *McClendon,* 779 S.W.2d at 71. The court declined to address the issue urged by the employee, whether the employment relationship justifies recognition of the tort duty of good faith. *See McClendon,* 779 S.W.2d at 69–70 n. 1. At present, the Texas courts do not recognize the employment relationship as warranting the tort duty of good faith.[8] Recognizing our role as a federal appeals court sitting in diversity and applying Texas law, we cannot boldly go where no Texas court has gone before. We cannot label the relationship between an independent sales representative and manufacturer as justifying tort duties that do not yet attend the employment relationship. Accordingly, we affirm the district court's grant of summary judgment against Caton's Texas tort claim for breach of the duty of good faith.

## VI.

## CONCLUSION

We have held that after the introduction of extrinsic evidence, Caton may be able to recover an allocable portion of commissions under the express contract with Leach. He may alternatively be able to sustain a claim based upon breach of California's implied contractual covenant of good faith, if it is found that Leach understood its obligation to compensate Caton for services under paragraph 8D and followed a course of conduct designed to avoid that compensation. The equitable theory of quantum meruit is not available to Caton, nor does Texas recognize a tort duty of good faith that would give him succor in these circumstances.

For the foregoing reasons, the judgment of the district court is AFFIRMED in part, REVERSED in part and REMANDED for further proceedings.

---

**8.** *See McClendon,* 757 S.W.2d at 819–20, *rev'd on other grounds,* 779 S.W.2d 69 (Tex.1989); *see also McClendon,* 779 S.W.2d at 71, 74 (Cook, J., dissenting) (Chief Justice Phillips and Justice Hecht joined Justice Cook); *id.* at 75 (Gonzalez, J., dissenting) (states that court refused to extend tort duty of good faith to employment at will); *cf. Bowser v. McDonalds Corp.,* 714 F.Supp. 839, 842 (S.D.Tex.1989) (per DeAnda, C.J.) (court found that employment relationship did not constitute special relationship under Texas law); *Lovell v. Western National Life Ins. Co.,* 754 S.W.2d 298, 303 (Tex.App.—Amarillo 1988, writ denied) (no special relationship existed between mortgagee and mortgagor).