**COMPOSIFLEX, INC., Plaintiff,**

v.

**ADVANCED CARDIOVASCULAR SYSTEMS, INC., Defendant.**

**Civ. A. No. 91–20 Erie.**

United States District Court, W.D. Pennsylvania.

May 21, 1992.

---

Norman Stark, MacDonald Illig Jones & Britton, Erie, Pa., for plaintiff.

Kerry A. Kearney, Don Webber, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

MENCER, District Judge.

Plaintiff Composiflex, Inc. ("Composiflex") initiated suit in February, 1991 against Advanced Cardiovascular Systems, Inc. ("ACS") alleging breach of contract and misappropriation of trade secrets. Composiflex is an Erie, Pennsylvania corporation while ACS has its principal place of business in Santa Clara, California. Presently before the court is a motion for summary judgment filed by Advanced Cardiovascular Systems, Inc. At the heart of the disagreement between the parties is a Development and License Agreement ("D & L Agreement") that the parties entered into on April 18, 1989.

ACS is a medical device company that was primarily formed in the late 1970s to manufacture angioplasty products. Angioplasty is an alternative to heart bypass surgery. Plaintiff Composiflex was contacted in 1986 by ACS to determine whether Composiflex had continuous process technology in place to make a urethane coated guiding catheter less expensively. Apparently Composiflex had developed the technology for structures with properties similar to those that ACS required. In July, 1988 Composiflex and ACS decided to enter into a long-term contract whereby Composiflex would develop a technique to manufacture in a "continuous" process a large quantity of urethane guiding catheters. After numerous drafts had been negotiated, the final contract was executed in April, 1989, which was the Development and License Agreement.

A key part of the D & L Agreement states:

### 1. *Process Development and Manufacture*

a. Composiflex shall proceed diligently to develop fully a process to produce commercially Development Products comprising urethane coated vascular guiding catheters, and supply ACS with proof of its capacity to manufacture at least 900 such guiding catheters per week in accordance with the specifications set forth in Exhibit A no later than 9 months from the effective date of this Agreement. ACS shall supply Composiflex with reasonably necessary quantities of Kevlar/Teflon catheter subassemblies required by Composiflex to meet its obligations under this Agreement.

b. Once ACS has made a determination that such guiding catheters supplied hereunder are clinically acceptable, ACS shall purchase, pursuant to standard ACS Purchase Orders, nine hundred (900) such guiding catheters per week from Composiflex for two (2) years.

ACS planned to compensate Composiflex for its work by paying it $148,500.00 for some of the development costs; $7.50 for each of the catheters that Composiflex manufactured for two years; and then a royalty of $2.00 per unit on each of the catheters that ACS manufactured for five years thereafter.

In order for the plan to work, both parties were required to disclose confidential information to one another. ACS had to disclose to Composiflex how it made its braid assembly in order for Composiflex to be able to impregnate it with urethane and then coat over the urethane. For its part, Composiflex had to disclose the precise group of urethanes, the exact method of impregnating the braid with urethanes, and the method of coating over the impregnated braid.

The project apparently ran into a number of snags which culminated in the critically important letter of October 18, 1990 from Tim Machold, an operations manager for ACS who was directing the guiding catheter program, to Alex Hannibal, the president of Composiflex. The letter stated:

Because of the future expenses, the size of available and budgeted resources, the need to support two guiding catheter product lines and discussing of these issues with management and staff we have chosen not to continue this project at this time. This seems to be a good point in the relationship to halt activity in that ACS knows very little of the technical details of the Composiflex process and has only performed heart model tests on the prototype to date. This limited exposure allows us to maintain mutual confidentiality which we feel is necessary.

In the future, we are planning to automate a urethane guiding catheter process. At that time, having a better understanding of a clinically superior guiding catheter perhaps we could continue to use the services of Composiflex. It is my hope that you will understand the circumstance of forming a new group, focusing on higher priority projects and the lack of resources to devote to the current arrangement.

I am sorry that my first contact with you had to be on these terms. Please call me to discuss this issue further at your earlier convenience.

Sincerely,

Tim Machold

Operations Manager, ASG

Composiflex asserts that this letter from Tim Machold was a unilateral termination of the contract. ACS, on the other hand, describes the letter as a response to a demand for $28,000 additional dollars that Composiflex asked for in a letter dated September 30, 1990. ACS believes that "As a result of the demand for more money, ACS notified Composiflex by letter dated October 18, 1990 that it had "chosen not to continue this project at this time." (Defendant's brief in support of motion for summary judgment at page 4). This would, on the surface at least, appear to be a strained interpretation of the Machold letter, in that no reference is made anywhere in the letter to any demand for additional funds by Composiflex. A factfinder would have to discover a cryptic message

in the Machold correspondence in order for the defendant's viewpoint to prevail on this particular issue.

The plaintiff in its response to the motion for summary judgment has come forward with another possible explanation for the October 18, 1990 letter from Tim Machold to Composiflex. That is the deposition testimony of Dr. Carl Mandleco, the person from ACS who originally developed the relationship between ACS and Composiflex. Dr. Mandleco was involved with ACS's legal department in the drafts that led up to the final D & L Agreement. He submitted the Agreement to Alan Hannibal of Composiflex and seems to have been the conduit for all negotiations between the two firms. In general, he was intimately involved in all areas of the negotiations leading up to the Agreement.

Dr. Mandleco in his deposition testimony describes a meeting that took place in October, 1990 that was called by Tim Machold. The testimony of Dr. Mandleco, if found credible by a reasonable factfinder, would raise serious questions regarding the good faith and fair dealing of ACS with regard to the performance of the contract. It also appears to the court Dr. Mandleco's testimony raises sufficient material questions of fact so that the nonmoving party, in this case Composiflex, has sufficiently met its burden of coming forward in order to withstand the motion for summary judgment. Dr. Mandleco's first reference is to Pat Macauley, a young man who had been overseeing Composiflex's performance of the contract for ACS. The following exchange took place at deposition between the attorneys and Dr. Mandleco:

Dr. Mandleco: Pat Macaulay came by and told me that they (ACS) had very similar equipment in house, very similar dies in house, and very similar ideas in house, and they were paralleling Composiflex. And I cautioned Pat, I said, "For goodness sake, Pat, think originality, think honesty and integrity. Don't get involved in a terrible mistake."

Mr. Stark: Q. All right. Did you ever hear that was an intentional objective of ACS, as opposed to an accidental parallel development?

Dr. Mandleco: I was witness to a meeting sometime in the late summer or early fall where I was summoned by a parchment ... There was no title on the document other than Tim Machold had called the meeting ... At that meeting we were asked—both Bruce Wand and I were asked what our understanding of the problems were with Composiflex.

We gave our—voiced our opinions, and one of the major opinions was—is that there was not enough time, appropriate enough time given the samples and the testing and the development for Composiflex, and that things were bogging down and that there was some unhappiness going on and some money problems, and there was some mismanagement of this and that. That's the basic conversation.

Malcolm Heaven mentioned something to the fact that we were paying for no technology. He didn't know what we were doing paying Composiflex for its technology.

*Out of the same conversation, Tim Machold popped up and said, well— and I'm not putting words in his mouth; I am paraphrasing from what I remember—"We are going to bury this thing for six or eight months, and then when things cool off, we'll resurrect the technology and use it."*

And, you know, I let it be known right away that I thought that was wrong, that I wouldn't buy it. I also said I thought we had to do—which Bruce Wand agreed, that we should pay Composiflex off; that whether I or somebody from Legal or in conjunction go back and sit down, go out to dinner, have a few beers, and figure out what the pissing contest is about, get to the bottom of it and just make the same comment that I always have, "What is it going to take to walk away friends?" In other words, "What do we owe you, and how can we keep you as friends and keep the technology?" Because it's more important for me to go back and have these guys as an ally in case we need them again.

And we were excused from the meeting.

Deposition testimony of Dr. Carl Mandleco (Emphasis added).

The court has included this extended excerpt from Dr. Mandleco's testimony for a number of reasons. First, it provides a significant alternative explanation for the motive behind the October 18, 1990 letter from Tim Machold to Composiflex. If a reasonable factfinder found the testimony of Dr. Mandleco credible, it may be determined that the Machold's purpose behind the letter was "to bury this thing for six or eight months, and when things cool off, we'll resurrect the technology and use it." In other words, a fair reading of the testimony would be that Machold held a meeting for the ostensible purpose of determining how ACS was going to abrogate its obligations under the contract, and resurrect the technology ACS had obtained from Composiflex and use it for its own purposes.

Another reason the testimony of Dr. Mandleco is significant is that he had worked on behalf of ACS, and was providing damaging evidence against ACS. That is the deposition excerpt when read in its entirety demonstrates a man whose loyalty to ACS was only superseded by his strong ethics and sense of fair play. When Pat Macaulay hinted that ACS had similar equipment, dies and equipment in house, Dr. Mandleco's response was swift and sure when he said, "For goodness sake, Pat, think originality, think honesty and integrity. Don't get involved in a terrible mistake." In a similar manner, when Tim Machold made his reference to burying the issue for six to eight months, Dr. Mandleco quickly replied that "I let it be known right away that I thought it was wrong, that I wouldn't buy it." These responses, when read along with the entire tenor of the Machold meeting, could result in a factfinder determining that the meeting and the resulting Machold letter to Composiflex constituted a unilateral breach of the contract.

This brings us to the question of what law the court should apply to resolve the issues set forth in the defendant's motion for summary judgment. In resolving a question of choice of law, a federal court exercising diversity jurisdiction must apply the conflict of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). A federal court sitting in diversity in Pennsylvania will follow the Pennsylvania choice of law rules, which, in turn, will follow the contractual choice of law provisions set out by the parties. *American Air Filter Co., Inc. v. McNichol*, 527 F.2d 1297, 1299, n. 4 (3d Cir.1975); *Instrumentation Assoc. v. Madsen Elec.*, 859 F.2d 4 (3d Cir.1988); *Reading Metal Craft Co., Inc. v. Hopf Drive Assoc.*, 694 F.Supp. 98 (E.D.Pa.1988); and *Jaskey Finance & Leasing v. Display Data Corp.*, 564 F.Supp. 160 (E.D.Pa.1983).

In the D & L Agreement at Paragraph 25, under the heading *Controlling Law,* the parties determined that "This Agreement shall be construed in accordance with the laws of the State of California as to all matters, including, but not limited to, matters of validity, construction, effect, or performance." Such choice of law provisions in contracts will generally be given effect in Pennsylvania. *Smith v. Commonwealth Nat'l. Bank*, 384 Pa.Super. 65, 557 A.2d 775, 777 (1989), *allocatur denied*, 524 Pa. 610, 569 A.2d 1369 (1990); *In re Allegheny Intern, Inc.*, 954 F.2d 167, 178 (3d Cir.1992). The court can find no compelling reason for denying the parties their contractual choice of law, and neither party objects to the application of California law. *See LCI Communications, Inc. v. Wilson*, 700 F.Supp. 1390, 1396 (W.D.Pa.1988).

It is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing. (1 Witkin, *Summary of Cal. Law* (8th ed. 1973) *Contracts*, § 576, p. 493; *see, e.g. Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818, 169 Cal.Rptr. 691, 620 P.2d 141; *Gruenberg v. Aetna Ins. Co.*, (1973) 9 Cal.3d 566, 573, 108 Cal.Rptr. 480, 510 P.2d 1032; *Crisci v. Security Ins. Co.*, (1967) 66 Cal.2d 425, 429, 58 Cal.Rptr. 13, 426 P.2d 173 ["*in every contract,* including

policies of insurance, there is an implied covenant of good faith and fair dealing ..." (*emphasis added in original*)]. Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement. (1 Witkin, *op. cit. supra*, at p 493; *Seaman's Direct Buying Serv. v. Standard Oil*, 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984)).

California courts have recognized the existence of this covenant, and enforced it, in cases involving a wide variety of contracts. *Standard Oil, supra*, 206 Cal.Rptr. at 362, 686 P.2d at 1166. In the present case, it appears that plaintiff Composiflex has come forward with enough evidence to meet its burden on a motion for summary judgment, as well as to raising substantial questions regarding a breach of the covenant of good faith and fair dealing on the part of ACS.

Under Fed.R.Civ.P. 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." This court is required, in resolving a motion for summary judgment pursuant to Rule 56, to determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In making this determination, the evidence of the nonmoving party is to be believed, and the district court must draw all reasonable inferences in the nonmovant's favor. *See id.* at 255, 106 S.Ct. at 2513.

While the movant bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact, Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essen-

tial to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Therefore, the party opposing the motion must come forward with "more than a mere scintilla of evidence in its favor" and " 'cannot simply reassert factually unsupported allegations contained in its pleading.' " *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

It appears that Composiflex has met the standards set forth by the Supreme Court in its 1986 trilogy of cases discussing summary judgment. The plaintiff has produced far more than a mere scintilla of evidence in its favor. It has come forward with the detailed testimony of Dr. Mandleco, which provides both an explanation and a motive for the alleged breach of contract. Summary judgment motions require judges to "assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide." *Williams; supra* at 460, *quoting Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513. The evidence is not so one-sided that a fair-minded jury must reasonably decide only for the defendant. To the contrary, it appears that there may have been a concerted effort on the part of ACS to "bury the issue for six to eight months" and breach the contract as well as utilize the information gleaned from the D & L Agreement to enhance its own position. For these reasons, the motion for summary judgment will be denied.

The court is aware that the defendant has raised serious questions in its motion as to whether Composiflex could "supply ACS with proof of its capacity to manufacture at least nine hundred (900) such guiding catheters per week" as required in paragraph 1(a) of the D & L Agreement. ACS may also make valid evidentiary points as to whether Composiflex had admitted in its deposition testimony that it did not meet the "concentricity" specifications set forth in Exhibit A to the D & L Agreement. While both of these positions may have merit, they do not present evidence that is so "one-sided" that a fair-minded

jury could reasonably find only for the defendant. Rather the fact-finder will have to weigh that evidence against the October 18, 1990 letter of Tim Machold and the explanation provided by Dr. Mandleco for the letter and make those credibility determinations at the time of trial.

■ Defendant ACS has also moved for summary judgment as to Count II of plaintiff's complaint, that being the charge of misappropriation of trade secrets. As an initial matter, the court must decide what choice of law to apply to the tort claim. The cases that have discussed the matter appear to examine the choice of law provisions of the individual contracts, and then determine, based upon their narrowness or breadth, whether the parties intended for the agreement to encompass all elements of their association. For example, narrow choice of law provisions have been held to apply only to the parties' contractual relationship. *See Klock v. Lehman Bros.*, 584 F.Supp. 210, 215 (S.D.N.Y.1984) ("this agreement shall be governed by the laws of the State of New York"). In *Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir. 1990), the clause stated that "this agreement shall be construed under the laws of the State of California." The court held that "the parties' narrow choice of law clause does not address the entirety of the parties' relationship," and thus did not apply to the plaintiff's tort claims. *Id.* at 943.

On the other hand, the Court of Appeals for the Sixth Circuit examined pertinent language which stated, "This Franchise and License Agreement and the construction thereof shall be governed by the laws of the state of Michigan ..." *Moses v. Business Card Express*, 929 F.2d 1131, 1139 (6th Cir.1991). The court found that "Clearly, the clause refers to more than construction of the agreement; otherwise the first six words would be surplusage." *Id.* at 1140. Similarly, the *Caton* court

described a broad clause which would dictate a state's law to "govern, construe and enforce all of the rights and duties of the parties arising from or relating in any way to the subject matter of this contract." *Caton v. Leach Corp., supra* at 943.

The court is convinced that the choice of law clause in the instant case is of the broad variety that was intended to embrace all aspects of the relationship. Paragraph 25 of the D & L Agreement states, "This Agreement shall be construed in accordance with the laws of the State of California as to all matters, including, but not limited to, matters of validity, construction, effect or performance." The parties envisioned a wide-ranging agreement when they chose to use terms such as "as to all matters" and "including, but not limited to" to describe the parameters of the relationship. As a result, the court will apply the laws of California to the misappropriation of trade secrets claim.

In California, what constitutes a trade secret is a question of law. *Acuson Corp. v. Aloka Co.*, 209 Cal.App.3d 425, 257 Cal. Rptr. 368, 373 (6th Dist.1989); *Agricultural Labor Relations Board v. Richard A. Glass Co.*, 175 Cal.App.3d 703, 221 Cal.Rptr. 63 (4th Dist.1985). Effective January 1, 1985, California adopted the Uniform Trade Secrets Act ("UTSA"), Cal.Civ. Code § 3426, *et seq.*, which was intended by the legislature to codify the results of the "better-reasoned cases" concerning the definition of trade secrets and their misappropriation. *American Paper & Packaging v. Kirgan*, 183 Cal.App.3d at 1318, 1324, 228 Cal.Rptr. 713 (1986); *Scott v. Snelling and Snelling, Inc.*, 732 F.Supp. 1034, 1042 (N.D.Cal.1990).[1]

The California law of trade secrets follows the Restatement definition:

A trade secret may consist of any formula, pattern, device or compilation of infor-

---

1. The Act defines a trade secret in the following manner:

"Trade Secret" means information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and

(2) Is the subjects of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal.Civ.Code § 3426.1(d) (West 1989).

mation which is used in one's business, and which gives him an advantage over competitors who do not know or use it ... Generally it relates to the production of goods, as for example, a machine or formula for the production of an article.

*By–Buk Co. v. Printed Cellophane Tape Co.,* 163 Cal.App.2d 157 at 166, 329 P.2d 147 at 152 (1958); *Richardson v. Suzuki Motor Co., Ltd.,* 868 F.2d 1226, 1243 (Fed.Cir.1989).

The burden of proof is on the plaintiff to show: (a) a legally protectable trade secret; and (b) a legal basis, either a covenant or a confidential relationship, upon which to predicate relief. *Imi–Tech Corp. v. Gagliani,* 691 F.Supp. 214, 230 (S.D.Cal.1986); *quoting Futurcraft Corp. v. Clary Corp.,* 205 Cal.App.2d 279, 283, 23 Cal.Rptr. 198 (1962). It appears that there exist sufficient facts before the court under that standard to permit the plaintiff to withstand the motion for summary judgment on the misappropriation of trade secrets claim. All that is required is that, except by use of improper means, there would be difficulty in acquiring the information. *Imi–Tech Corp., supra* at 231.

Initially, it does appear that Composiflex possessed information that fit the definition of a trade secret. Composiflex had a method of applying urethane coating materials to various fabrics in different shapes. They had developed the technology consisting of impregnating a reinforcing fiber braid with two different levels of stiffness of thermoset polyurethanes. Composiflex had developed reinforced tubular products prior to contact with ACS. They had a trade secret which consisted of "a compilation of information which is used in one's business, and which gives him an advantage over competitors who do not know or use it ... and it generally relates to the production of goods." *Richardson, supra,* 868 F.2d at 1243.

Composiflex also can meet the second part of the trade secret test, namely that there is "a legal basis, either a covenant or confidential relationship, upon which to predicate relief." *Imi–Tech, supra,* 691

F.Supp. at 230. Plaintiff correctly points out that the parties at Paragraph 12 of the D & L Agreement go into great detail spelling out the parameters of the confidentiality that was to be maintained with regard to their exchange of information. Both parties were cognizant that the exchange of confidential information was an essential element of the contractual relationship, and committed themselves to very specific terms in spelling out the terms and conditions of the contract.

Plaintiffs may also be able convince a factfinder that they meet the other prong of the *Imi–Tech* test, that is "that, except by use of improper means, there would be difficulty in acquiring the information." *Id.* at 231. ACS apparently had a problem when they would grind the coated shaft of the catheters in order to make them smooth and round, and this would damage many of the catheters because the coating on the catheter was not concentric. As a result, the percentage of good quality catheters was quite low. It was this information on how to solve the problem with the catheters that Composiflex possessed, as it was able to coat the Kevlar braid smoothly and give it the desired physical characteristics. There was difficulty for ACS to acquire this information from any other source than Composiflex, that is why Dr. Mandleco in September 1987 undertook a nationwide search for someone who already had the manufacturing proficiency to solve the problem. As a result, ACS entered into the D & L Agreement with Composiflex. The court believes this prong of the trade secret test has also been met, namely tht ACS would have had "difficulty in acquiring the information, except by use of improper means."

The issues are many that remain before this complex matter will be resolved. Both sides have presented voluminous material to support their positions. The court is confident, however, that a reasonable factfinders can sort through the facts and make the credibility determinations that is their function. The court will deny the

motion of defendant ACS for summary judgment.